**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| LATASHA RAYFORD, as Guardian for | ) | |
| LaVonte Rayford, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-CV-1129 |
| | ) | |
| McLEAN COUNTY SHERIFF'S OFFICE, | ) | |
| SHERIFF JON SANDAGE, McLEAN COUNTY, | ) | |
| THOMAS SCHROEDER, OFFICER REUTER, | ) | |
| OFFICER PACHA, OFFICER WAHLS, | ) | |
| OFFICER SMITH, OFFICER KERR, OFFICER | ) | |
| MCCORMICK, OFFICER SCHAPMIRE, | ) | |
| OFFICER HITCHENS, OFFICER BUHLIG, | ) | |
| OFFICER SWART, OFFICER MANN, | ) | |
| OFFICER STARR, OFFICER MAYS, | ) | |
| MICHELLE WELCH, BONNIE BROWN, | ) | |
| SUZANNE SCOTT, NANCY GRIFFIN, | ) | |
| TERESA CIRKS, KATHY MURPHY, | ) | |
| JENNIFER GARCIA and CHERYL STURGILL, | ) | |
| | ) | |
| Defendants. | ) | |

## CORRECTIONAL DEFENDANTS/COUNTY/ SHERIFF'S MOTION FOR SUMMARY JUDGMENT

Now Come Defendants, McLean County, McLean County Sheriff's Office, Sheriff Jon Sandage, Thomas Schroeder, Jennifer Reuter, Ken Pacha, Tyler Wahls, Timothy Smith, Scott Kerr, Thomas McCormick, Mary Schapmire, Nicholas Hitchins, Sarah Buhlig, Devon Swart, Timothy Mann, David Starr and Michael Mays by and through their attorneys, Dunn Law Firm LLP, and submit this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D).

I.      INTRODUCTION

Plaintiff, Latasha Rayford, filed this lawsuit as guardian of her son, LaVonte Rayford.  Plaintiff seeks damages under 42 U.S.C. § 1983 against the Individual Correctional Defendants and Individual Medical Defendants for alleged violations of Rayford's Fourth Amendment rights and a claim against the Sheriff pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658, 735 (1997).  Plaintiff also seeks indemnification against McLean County.

In large part, Plaintiff seeks to hold every officer and jail nurse that happened to be working the evening of June 26th or on June 27th liable under section 1983 for allegedly violating Rayford's constitutional right to adequate medical care regardless of their personal involvement.  Plaintiff also seeks to impose liability on the McLean County Sheriff under *Monell* despite by his own admission only complaining about a single incident, his own experience related to his failure to receive seizure medication.

For the reasons discussed below, the Individual Correctional Defendants, McLean County Sheriff and McLean County are entitled to summary judgment.

II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### *Parties, Allegations, Jurisdiction and Venue*

1.      Latasha Rayford, as guardian for her son LaVonte Rayford, brings claims against fourteen (14) correctional officers, Thomas Schroeder, Jennifer Reuter, Ken Pacha, Tyler Wahls, Timothy Smith, Scott Kerr, Thomas McCormick, Mary Schapmire, Nicholas Hitchins, Sarah Buhlig, Devon Swart, Timothy Mann, David Starr and Michael Mays, and eight (8) jail nurses, Suzanne Scott, Nancy Griffin, Teresa Cirks, Kathy

Murphy, Jennifer Garcia, Bonnie Brown, Michelle Welch, and Cheryl Sturgill, who were on shift at the Jail on either June 26, 2019 or June 27, 2019 while Rayford was a pretrial detainee at the McLean County Detention Facility ("Jail"). (Plaintiff's First Amended Complaint, Doc. #6).

2.     In Plaintiff's Amended Complaint, Plaintiff alleges that the correctional officers and jail nurses deprived Rayford of his Fourth Amendment due process right to adequate medical care. Plaintiff claims that the officers and nurses violated his Fourth Amendment rights to medical treatment by failing to ensure that he was given his anti-seizure medication and to otherwise protect him from injuries due to his epilepsy. (Plaintiff's First Amended Complaint, Doc. #6).

3.     Specifically, Plaintiff claims that Rayford had a medical diagnosis of epilepsy and valid seizure medications when he was taken into custody on June 26, 2019 and that he needed to take his seizure medications twice daily:  once in the morning and once in the evening. (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 14-17).

4.     Plaintiff claims that after Rayford was taken into custody on June 26, 2019, Officer Thomas Schroeder ("Officer Schroeder") confiscated multiple medications from Rayford and Plaintiff, including Rayford's seizure medication and was informed by Plaintiff that Rayford needed to take the seizure medication twice daily and that Rayford had not yet taken his evening dose of the seizure medication. (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 19-20).

5.      Plaintiff asserts that Officer Schroeder did not contact Rayford's physician to verify that Rayford needed to take his seizure medication and that Rayford was not provided with his evening dose of his seizure medication.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 21-22).

6.      Plaintiff claims that she contacted the Jail the next day on June 27, 2019 and spoke with an unknown nurse and informed this nurse that Rayford needed to take his seizure medication.  Plaintiff asserts that this nurse told her that there was no verification from any medical professional that Rayford needed to take seizure medication, and, absent that order, Rayford would not be provided the medication by jail staff.   (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 23-24).

7.      According to Plaintiff, she then contacted Rayford's physician and informed them of the situation which prompted a member of Rayford's physician's staff to contact the Jail on June 27, 2019 at 10:20 AM to ensure Rayford was being provided his seizure medication. (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 25-26).

8.      According to Plaintiff, the Jail then received a fax from Rayford's physician on June 27, 2019 at 10:45 AM which contained a list of medications prescribed to Rayford, including the times Rayford needed to take each medication, and that Rayford was not provided his seizure medication thereafter.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 27-28).

9.      Plaintiff asserts that Rayford suffered at least three seizures on June 27, 2019 at 1:30 PM, 3:30 PM and 3:57 PM before being taken to the hospital due to not receiving his evening dose of seizure medication on June 26, 2019 and his morning dose

4

of seizure medication on June 27, 2019.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 29-36).

10.    Plaintiff claims that because all the correctional staff were assigned to booking duty during the time Rayford was taken into custody between his initial booking and his transport to the hospital following the seizures, they violated his Fourth Amendment rights and acted unreasonably in failing to contact Rayford's physician to verify that he needed to take his seizure medication and/or by not providing Rayford his seizure medication.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 40, 44-50).

11.    Plaintiff claims that because all the jail nurses were assigned to medical staff duty at the Jail during the time Rayford was taken into custody between his initial booking and his transport to the hospital following the seizures, they violated his Fourth Amendment rights and acted unreasonably by failing to contact Rayford's physician to verified that Rayford needed his seizure medication, failed to timely alert other jail staff of the received notice from Rayford's physician, and by not providing Rayford's seizure medication to him.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 41, 44-50).

12.    Plaintiff identifies two jail nurses, Nancy Griffin and Teresa Cirks, as being responsible for distributing the medical [*sic*] to detainees during the time Rayford was in custody but did not provide any medication to him.  (Plaintiff's First Amended Complaint, Doc. #6, ¶ 42).

5

13.    Plaintiff claims that all the individual defendants, both jail nurses and correctional staff, acted unreasonably in failing to provide Rayford with any medical treatment following the first two seizures.  (Plaintiff's First Amended Complaint, Doc. #6, ¶ 48).

14.    Plaintiff also brings a *Monell* claim against the McLean County Sheriff alleging that the jail had gaps in its policies pertaining to the timely completion of its booking process for inmates and its verification and approval process for prescription medications brought into the Jail by a family member on behalf of an inmate.  Plaintiff claims that these asserted gaps in policy caused Rayford to suffer injuries, at least three seizures, while in custody.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 51-67). Plaintiff seeks punitive damages against the McLean County Sheriff under her *Monell* claim.  (*Id*.).

15.    Finally, Plaintiff seeks indemnification of the McLean County Sheriff's Office by McLean County pursuant to 745 ILCS 10/9-102.  (Plaintiff's First Amended Complaint, Doc. #6, ¶¶ 68-70).

16.    At all relevant times, Defendants Thomas Schroeder, Jennifer Reuter, Ken Pacha, Tyler Wahls, Timothy Smith, Scott Kerr, Thomas McCormick, Mary Schapmire, Nicholas Hitchins, Sarah Buhlig, Devon Swart, Timothy Mann, David Starr and Michael Mays were employed as correctional staff working for the McLean County Sheriff's Department.  (Defendants' Answer and Affirmative Defenses, Doc. # 24).

17.    At all relevant times, Defendants Suzanne Scott, Nancy Griffin, Teresa Cirks, Kathy Murphy, Jennifer Garcia, Michelle Welch, Bonnie Brown and Cheryl

Sturgill were employed by McLean County as nurses at the Jail.  (Defendants' Answer and Affirmative Defenses, Doc. # 24).

18.    At all relevant times, Defendant Jon Sandage was the Sheriff of McLean County.  (Defendants' Answer and Affirmative Defenses, Doc. # 24).

19.    Defendant McLean County Sheriff's Department operates the Jail. (Defendants' Answer and Affirmative Defenses, Doc. #24).

20.    This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331. (*Id*.).

21.    Venue is proper in the Central District pursuant to § 1391(b).  (*Id*.)

### *The Organizational Structure and Operations of the Jail*

22.    Since June 2019, Diane Hughes ("Hughes") has been the jail superintendent for the Jail and prior to that time was employed in various capacities with the McLean County Sheriff's Department including as a correctional officer, sergeant, operations supervisor and assistant jail superintendent.  (Diane Hughes 30(b)(6) deposition attached as Exhibit 1, p. 9, lines 20-24, p. 10, lines 1-18; Diane Hughes Declaration attached as Exhibit 2, ¶2).

23.    As Jail Superintendent, Hughes has responsibility and oversight over jail operations under the direction of the Sheriff. (Ex. 1, Hughes dep., p. 10, lines 19-24; Ex. 2, Hughes Decl., ¶2).  In that position, Hughes works on reviewing Jail policies and procedures which are conducted on an annual and "as needed" basis.  (Ex. 1, Hughes dep., p. 11, lines 1-24, p. 12, lines 1-19).

24.     Correctional officers are responsible for guarding inmates of the Jail including but not limited to observing conduct and behavior of inmates to prevent disturbances and escapes, searching inmates and cells for contraband and guarding and directing inmates during assignment.  (Ex. 2, Hughes Decl., ¶74).

25.     Correctional officers have direct contact with inmates and are responsible for maintaining the safety and security of the inmates and correctional staff of the Jail. (Ex. 2, Hughes Decl., ¶75).

26.     The normal hours of work for a correctional officer at the Jail are divided primarily into three (3) shifts:  1st shift (7:00 a.m. – 3:00 p.m.); 2nd shift (3:00 p.m. – 11:00 p.m.); and 3rd shift (11:00 p.m. - 7:00 a.m.).  The workday for correctional officers is typically eight (8) hours and the workweek is five (5) consecutive days of duty followed by two (2) days off.  (Ex. 2, Hughes Decl., ¶76).

27.     The Jail mandates overtime for correctional officers because of safety and security concerns and to maintain adequate and minimum staffing levels.  Correctional officers at the Jail follow a chain of command, reporting to the on-duty sergeant.  (Ex. 2, Hughes Decl., ¶77).

28.     The on-duty sergeant is the watch commander for a particular shift.  The watch commander is in a supervisory position and directs the execution of all Jail orders as they relate to guard activities, security and control of inmates and supervises the officers assigned to the shift.  (Ex. 2, Hughes Decl., ¶78; Watch Commander Post Orders attached as Exhibit 3, MC 00027-00033).

29.    Minimum staffing levels at the Jail are maintained and an officer assigned to every post.  (Ex. 2, Hughes Decl. ¶79).

30.    Officers assigned to the Booking Area are generally responsible for receiving, processing, retaining and releasing all persons admitted to the Jail.  Officers assigned to the booking area also book new intakes into the Jail using the E*Justice System or EJS, the Jail's computer management system, and conduct frequent and staggered supervision checks on inmates as required.  (Ex. 2, Hughes Decl., ¶10; Booking Area Post Orders attached as Exhibit 4, MC 00012-00014; Deposition of Raymond Loftus attached as Exhibit 25, p. 20, lines 16-24, p. 21, lines 1-3).

31.    The EJS System or E*Justice System is the jail management system and is used by correctional staff to complete an inmate's booking and communicate any reported medical concerns or needs to the Jail's medical staff.   (Ex. 1, Hughes dep., p. 20, lines 4-7; Ex. 2, Hughes Decl., ¶10).

32.    At all times relevant, there were typically two officers assigned to the booking area on each shift.  (Ex. 2, Hughes Decl. ¶79).

33.    During the relevant time, the Jail had an Inmate Services department which provided counseling services to inmates, assisted in obtaining social histories from inmates, and provided input as to an inmate's housing assignment.  (Ex. 1, Hughes dep., p. 37, lines 1-24; p. 38, lines 1-17).

34.    Jackie Mathias was a member of Inmate Services during the relevant times.   (Ex. 1, Hughes dep., p. 37, lines 1-23).

35.     At all relevant times, the Jail had a Health Services unit and the County employed a nursing staff at the Jail who provided on-site nursing services seven (7) days a week, 365 days a year typically between the hours of 6:00 – 7:00 AM to 7:00 PM (Ex. 1, Hughes dep., p. 55; Suzanne Scott deposition attached as Exhibit 17, p. 31, lines 3-16).

36.     At all relevant times, the Jail had a contract with Advanced Correctional Healthcare ("ACH") to provide inmate medical services at the Jail.  (Access to Care policy attached as Exhibit 5, MC 00107-00109, subparagraph B(1); Ex. 17, Scott dep., p. 30, lines 4-5).

37.     Pursuant to the contract, ACH provided a physician, Dr. Hughes Lochard, for the Jail who oversaw the care of all inmates that were in custody, conducted sick call during site visits, entered orders for testing, procedures and medications and otherwise provided direction to the County nursing staff.  (Ex. 5; Ex. 17, Scott dep., p. 25, lines 10-24, p. 26, lines 1-8, 23-24, p. 27, lines 1-22, p. 33, lines 9-17).

38.     As the Jail Physician, Dr. Lochard was on-site at least one day per week, and on-call otherwise.  (Ex. 17, Scott dep., p. 27, lines 19-22, p. 28, lines 20-24, p. 29, lines 20-24).

39.     At all relevant times, the Jail had a contract with a mental health provider, Dr. Babatunde Okuleye.  (Ex. 17, Scott dep., p. 26, lines 9-19).  Typically, Dr. Okuleye was responsible for entering orders approving any mental health medications.  (Ex. 17, Scott dep., p. 33, lines 16-17).

40.    At all relevant times, Michelle Welch was a registered nurse employed by the County and held the position of nursing supervisor.  (Ex 1., Hughes dep., p. 51, lines 4-18; Ex. 17, Scott dep., p. 57, lines 23-24, p. 58, lines 1-7).

*Relevant Jail Policies and Procedures*

41.    At all times relevant, the Jail had in place specific policies and procedures concerning the intake and booking of inmates and medical services to inmates.  (Ex. 2, Hughes Decl., ¶¶ 3-4; Ex. 3; Ex. 4; Ex. 5; Admissions Booking Procedure attached as Exhibit 6, MC 00043-00053; Receiving Screening attached as Exhibit 7, MC 00114-00116; Communication of Patients' Health Needs attached as Exhibit 8, MC 00110-00112; Incoming Personal Property attached as Exhibit 9, MC 00101-00102; Pharmaceutical Operations attached as Exhibit 10, MC 00068-00072; Emergency Services attached as Exhibit 11, MC 00118-00120; Medication Services attached as Exhibit 12, MC 00078-00079; Continuity of Care attached as Exhibit 13, MC 00123-00125; Holding Cells attached as Exhibit 14, MC 00292-00293; Medication Administration Training attached as Exhibit 15, MC 00060; Health Services policy acknowledgement attached as MC 00106; see also Ex. 1, Hughes dep. generally (30(b)(6) deposition)).

42.    These policies were designed to ensure that inmates are timely processed for booking in the Jail.  (Ex. 1, Hughes dep., p. 33, lines 12-23, p. 34, lines 4-24, p. 35, lines 1-24, p. 36, lines 1-24).

43.    The Jail's policy is to ensure that the intake and booking process for a new custody is completed as soon as practicable.  (Ex. 1, Hughes dep., p. 33, lines 12-23, p. 35, lines 7-14; Ex. 6, MC 00051; Ex. 7, MC 00114).

44.    The Jail's intake and booking process involves several steps with a booking officer first assessing an inmate's fitness at confinement, verifying the legality of the commitment documents, and conducting weapons search, discovery search and property search.  (Ex. 2, Hughes Decl. ¶ 13; Ex. 6, MC 00044-00047).

45.    Upon completion of the intake admissions procedures, the Booking Officer accepts official custody of an inmate, and the booking process is commenced. (Ex. 2, Hughes Decl., ¶ 14; Ex. 6, MC 00047).

46.    Pursuant to the Jail's booking procedure, an inmate's property is confiscated including any medication that is brought in by the custody and a booking screening and Medical/Psychological screening of the custody is performed by the booking officer.  (Ex. 2, Hughes Decl., ¶15; Ex. 6, MC 00047-00049, MC 00050-00051).

47.    The Booking Officer will ask the custody all questions on the Booking Screening and not assume any answers or leave any areas blank.  (Ex. 2, Hughes Decl., ¶16; Ex. 6, MC 00050).

48.    The Booking Officer will ask the custody all questions listed on the Medical/Psychological Screening and not assume any answers.  (Ex. 2, Hughes Decl., ¶17; Ex. 6, MC 00050).

49.    Pursuant to Jail policy, in the event the booking process cannot be completed the Watch Commander shall notify Sergeants, Medical Staff, Inmate Services and Administration via email that the booking process needs to be completed, the custody is in need of further follow up, and any information deemed important will be distributed to the appropriate people.  (Ex. 2, Hughes Decl., ¶18; Ex. 6, MC 00051).

50.     Pursuant to the Jail's booking procedure, every effort will be made, on each shift, to complete the booking process until the booking process has been completed.  (Ex. 1, Hughes dep., p. 33, lines 12-23, p. 34, lines 4-24, p. 35, lines 1-24, p. 36, lines 1-24; Ex. 2, Hughes Decl., ¶19; Ex. 6, MC 00051; Deposition of Scott Kerr attached as Exhibit 24, p. 34, lines 5-17, p. 58, line 24, p. 59, lines 1-8).

51.     There are circumstances in which the booking process may be delayed for a new custody including the custody's unwillingness to answer questions, intoxication, and because the custody is agitated, angry, uncooperative and/or combative.  (Ex. 1, Hughes dep., p. 17, lines 13-18; Ex. 24, Kerr dep., p. 57, lines 5-17;  Ex. 25, Loftus dep., p. 21, lines 4-24, p. 22, lines 1-15).

52.     Pursuant to Jail policy, a receiving screening is performed for all new custodies on arrival at the Jail to ensure emergent and urgent health needs are met.  (Ex. 2, Hughes decl., ¶20; Ex. 7, MC 00114; Ex. 8, MC 00110-00112).

53.     Pursuant to Jail policy, the initial receiving screening process will take place for all inmates during the booking process by correctional officers.  (Ex. 2, Hughes Decl., ¶21; Ex. 8, MC 00114).

54.     Pursuant to Jail policy, the receiving screening will take place as soon as possible for all inmates who are not bonding out of the Jail in the near future.  (Ex. 2, Hughes Decl., ¶22; Ex. 7, MC 00114).

55.      The receiving screening includes gathering information concerning an inmate's past and current illnesses, health conditions and any current prescription

medication and completing a medical questionnaire called a Medical Screening Form or

Medical Screening Report. (Ex. 2, Hughes Decl., ¶23; Ex. 7; Ex. 8, MC 00110).

56.    The Medical Screening Form is typically completed by the booking officer.

(Ex. 2, Hughes Decl., ¶24; Deposition of Ken Pacha attached as Exhibit 23, p. 38, lines 6-

22).

57.    The Booking Officer is required to ask the custody all questions on the

Medical Screening Form and will not assume any answers.  (Ex. 2, Hughes Decl., ¶25;

Ex. 6, MC 00050; Ex. 24, Kerr dep., p. 43, lines 2-8).

58.    Pursuant to Jail policy, the booking officer will make inquiries on the

Medical Screening Form including inquiries regarding past and current illnesses, health

conditions, and special health requirements, and inquire of the custody as to whether

any the inmate takes any medications.  (Ex. 2, Hughes Decl., ¶26; Ex. 7, MC 00115).

59.    The Medical Screening Form is the last step of the booking process flow

and once completed, an inmate's booking is concluded.  (Ex. 2, Hughes Decl., ¶27; Ex.

25, Loftus dep., p. 39, lines 14-24, p. 40, lines 1-2).

60.    Any inmate with medical issues identified during the receiving screening

will be immediately referred to the Health Services staff for proper diagnosis and

planned treatment by means of a "notification" on the EJS system.  (Ex. 2, Hughes Decl.,

¶28; Ex. 7, MC 00116; Ex. 8, MC 00110; Ex. 25, Loftus dep., p. 39, 14-18).

61.    The EJS system provides an autogenerated notification to the Health

Services staff of inmates with medical issues, including identifying any inmate

medications. (Ex. 2, Hughes Decl., ¶29; Ex. 7, MC 00116; Ex. 8, MC 00110; Ex. 17; Scott

14

dep., p. 24, lines 12-24; p. 25, lines 1-4; Ex. 21, Deposition of Bonnie Brown attached as

Exhibit 21, p. 33, lines 9-24, p. 34, lines 1-24, p. 35, lines 1-24, p. 36, lines 1-23).

62.    The EJS system logs the date and time that the EJS notification is sent to

Health Services staff.  (Ex. 2, Hughes Decl., ¶29; Sun email with screenshot attached as

Exhibit 45).

63.    Pursuant to Jail policy, Health Services staff will review all "notifications"

on an on-going basis and provide additional follow up as necessary.  (Ex. 2, Hughes

Decl., ¶30; Ex. 8, MC 00110; Ex. 21, Brown dep., p. 35, lines 1-19).

64.    Additionally, the Health Services staff will review the completed Medical

Screening Form within a reasonable amount of time following an inmate's

incarceration.  (Ex. 2, Hughes Decl., ¶ 31; Ex. 8, MC 00110).

65.    Pursuant to Jail policy, medication will be accepted into the Jail and any

medication brought in by an inmate or received from the public will be placed in the

locked Medication Box in the Booking Clerk's office and logged on the Property Receipt

with Health Services staff notified by a phone call or email.  (Ex. 2, Hughes Decl. ¶ 32;

Ex. 6, MC 00048-00049; Ex. 9, MC 00101; Ex. 23, Pacha dep., p. 24, lines 6-24, p. 25, 1-24).

66.    The nurses are required to check the locked Medication Box in the

Booking Clerk's office at least once a day and as otherwise needed.  (Ex. 2, Hughes

Decl., ¶ 33; Ex. 25, Loftus dep., p. 51, lines 18-24, p. 52, lines 1-9; Deposition of Nancy

Griffin attached as Exhibit 22, p. 22, lines 6-21).

67.    At all relevant times, the Jail had policies and procedures in place to

provide qualified health services to inmates including the administration of approved

medications to inmates and said policies were reviewed and approved by the Jail

Physician, Dr. Lochard.  (Ex. 2, Hughes Decl., ¶34; Exs. 5-16; Ex. 16, MC 00060).

68.     These policies were designed to ensure that inmates receive adequate

medical care. (Ex. 2, Hughes Decl., ¶ 35; Exs. 5-16).

69.     Pursuant to Jail policy, all medications are under the control of Health

Services. (Ex. 2, Hughes Decl., ¶ 36; Ex. 10, MC 00069).

70.     According to Jail policy, inmates entering the Jail with prescription

medication will continue to receive the medication as prescribed, or acceptable alternate

medications as clinically indicated and administration is to be completed in a timely

manner following verification and an order from the Jail Physician.  (Ex. 2, Hughes

Decl., ¶ 37; Ex. 9; Ex. 12; 00079; Ex. 17, Scott dep., p. 37, lines 10-15).

71.     This verification and approval process is typically performed by Health

Services staff with nursing staff first verifying the medication by either contacting the

dispensing pharmacy identified on the medication bottle or contacting the prescribing

physician's office.  (Ex. 2, Hughes Decl. ¶ 39; Ex. 17, Scott dep., p. 37, lines 4-24, p. 38,

lines 1-20).

72.     Once verified, Health Services staff would then contact the Jail Physician

(at the time Dr. Hughes Lochard) typically over the phone who then would be

responsible for entering medication orders for the particular inmate.  (Ex. 2, Hughes

Decl., ¶ 39 (second); Ex. 17, Scott dep., p. 38, lines 5-20).

73.     If the Jail Physician approves the medication and enters orders for the

medication to being given to an inmate, Health Services staff begins the process of

administering the medication to the inmate.  (Ex. 2, Hughes Decl., ¶ 41; Ex. 9; Ex. 12; Ex.

Ex. 13, MC 00124; Ex. 17, Scott dep., p. 38, lines 21-22).

74.    Prescription medications are administered to inmates by the Health

Services staff only when clinically indicated and upon the order of the Jail Physician.

(Ex. 2, Hughes Decl., ¶ 42; Ex. 12, MC 00078; Ex. 17, Scott dep., p. 38, lines 21-22).

75.    The jail nursing staff is primarily responsible for passing out medication

to inmates once the jail physician's order is received.  (Ex. 2, Hughes Decl., ¶ 43; Ex. 10,

MC 00124; Ex. 12, MC 00078).

76.    Per Jail policy, the Health Services staff does not utilize standing orders.

(Ex. 12, MC 00078).

77.    In the event that jail nursing staff is not available on-site, the on-call jail

physician may authorize the shift's watch commander to administer medication to an

inmate. (Ex. 2, Hughes Decl., ¶ 44; Ex. 10, MC 00069).

78.    Correctional officers may also give medication listed on a briefing that

needs to be administered during the night or medication specially ordered by the Jail

Physician in the absence of Health Services staff. (Ex. 2, Hughes Decl. ¶ 45; Ex. 10, MC

00069; Ex. 15, MC 00060).

79.    The verification and approval process of medication is completed as soon

as practicable to ensure administration of clinically appropriate medication in a timely

manner.  (Ex. 1, Hughes dep., p. 47, lines 3-19; Ex. 2, Hughes Decl., ¶ 46; Ex. 12, MC

00079; Ex. 17, Scott dep., p. 85, lines 21-24, p. 86, lines 1-4).

80.     Pursuant to Jail policy, medication is dispensed to inmates by Health Services staff twice a day during medication pass, and also as needed.  (Ex. 2, Hughes Decl., ¶ 47; Ex. 10, MC 00070)

81.     Health Services staff documents the administration of medication to inmates in an inmate's Medication Administration Record.  (Ex. 2, Hughes Decl., ¶ 48; Ex. 10, MC 00070).

82.     An inmate's medical records are maintained in the Jail's Health Services Unit by the jail nurses including any medical records received from an outside provider.  (Ex. 2, Hughes Decl., ¶ 49; Ex. 22, Griffin dep, p. 50, lines 7-24, p. 51, lines 1-5; Ex. 24, Kerr dep., p. 76, lines 14-21).

83.     Correctional officers do not have access to an inmate's medical records either through EJS or otherwise. (Ex. 2, Hughes Decl., ¶ 50; Ex. 22, Griffin dep., p. 50, lines 7-24, p. 51, lines 1-24, p. 52, 1-24; Ex. 24, Kerr dep., p. 76, lines 14-21).

84.     Health Services can be notified of medication received for an inmate through the EJS notification, by email, in person or by a call from correctional staff. (Ex 1, Hughes dep. p. 25, lines 8-14).

85.     Correctional staff rely on the jail nursing staff and jail physician for the medical treatment of detainees and refer any medical issues or medical requests by detainees to the nursing staff. (Ex. 2, Hughes Decl., ¶ 51).

86.     Correctional staff rely on Inmates Services and mental health counselors for the mental health needs of Jail inmates and refer requests for mental health

treatment by detainees to Inmate Services and/or medical staff.  (Ex. 2, Hughes Decl., ¶ 52).

87.     The Jail had training requirements in place during the relevant time, which included the following:  (1) completion of a 200-hour basic academy program; (2) review of the Jail's written policies and procedures specific to correctional staff; (3) completion of a field training program; (4) completion of periodic training on an annual basis; (5) health related training on first, CPR, AED, on how to conduct a proper and thorough medical/psychological training screening, and on the procedures for appropriate referral of inmates to health professionals.  (Ex. 2, Hughes Decl., ¶¶ 5-9).

### *Lavonte Rayford's History, Prior Custodies and Criminal Charges*

88.     Rayford suffered significant brain injuries in childhood, with lifelong effects on his capacity to regulate his affect and his behavior.  (Dr. Norman Kohn's Report dated 1/5/21 attached as Exhibit 28, p. 2; Latasha Rayford deposition attached as Exhibit 18, p. 39, lines 19-25, p. 40, lines 1-25, p. 41, lines 1-12, p. 42).

89.     At age 6 he fell, sustaining a brain injury and lifelong seizures.  Three years later he was severely injured in a car accident.  The aftermath of the first injury included complex partial seizures with secondary generalization; after the second he had significant cognitive impairment and required a special school program.  Rayford's records describe the later diagnosis of bipolar disorder.  (Ex. 28, p. 2; Ex. 18, Latasha dep., p. 39, lines 19-25, p. 40, lines 1-25, p. 41, lines 1-12, p. 42).

90.     Due to his childhood injuries, Rayford suffered cognitive impairment, and epilepsy that was not readily controlled with medication.  (Ex. 28, p. 3; Ex. 18, Latasha

dep., p. 82, lines 3-23; p. 142, lines 21-25, p. 143, lines 1-6, p. 143, lines 11-25, p. 144, lines 1-25, p. 145, lines 1-6, p. 146, lines 7-25; p. 147, lines 1-25, p. 148, lines 1-10).

91.     In 2021, due to Rayford's seizures not being controlled with medication, Rayford had brain surgery to stop or otherwise minimize the seizures.  (Ex. 18, Latasha dep., p. 47, lines 14-25, p. 48, lines 1-3; Deposition of Dr. Norman Kohn attached as Exhibit 20, p. 158, lines 1-19).

92.     Because of his cognitive impairment, Rayford was adjudicated in 2018 to need a guardian.  Latasha Rayford was appointed as her son's guardian and has served as such since 2018.  (Ex. 28, p. 3; Ex. 18, Latasha dep., p. 32, lines 13-24, p. 60, lines 2-25).

93.     According to Plaintiff, she manages her son's medications and his medical appointments, care and treatment and did so during the timeframe at issue.  (Ex. 18, Latasha dep., p. 32, lines 13-24).

94.     According to Plaintiff's expert, Dr. Kohn, Rayford suffers from epilepsy and his seizures are intractable in nature, meaning they are uncontrolled and resistant to medication.  Despite taking various medications to help control his seizures, he continued to have seizure activity.  (Ex. 28, p. 2-3).

95.     According to Dr. Kohn, Rayford's seizures have been difficult to control despite excellent medical care.  They have been triggered at times by stimuli including sleep deprivation, a common destabilizer for many individuals.  (Ex. 28, p. 2-3).

96.     On March 17, 2017, Keppra was added to Rayford's seizure medication regime.  Subsequently, he continued to have poorly controlled epilepsy with episodes of prolonged mental impairment that were consistent with seizure induced ("postictal")

effects of brain function. (Ex. 28, p. 3). According to Dr. Kohn, Rayford also experienced uncommon side effects of Keppra including agitation, anger and irritability. (*Id*.).

97.    At the end of December 2018, Rayford's prescription for Keppra was discontinued by his neurologist at the time Dr. Choudhry, but Rayford continued to receive Keppra unknowingly when treated at the local hospitals for breakthrough seizures on at least five occasions. (Ex. 28, p. 3; Ex. 18, Latasha dep., p. 33, lines 14-25, p. 34, lines 1-17, p. 35, lines 1-18).

98.     In 2018 and 2019, Rayford faced charges of various unlawful behaviors, which were alleged to have occurred during or soon after the period of his treatment with Keppra. (Ex. 28, p. 3; Ex. 18, Latasha dep., p. 43, lines 14-24, p. 44, lines 1-25, p. 45, lines 51, lines 17-25, p.  52, lines 1-13, p. 53, lines 1-25, p. 54, 1-24, p. 55, lines 1-24, p. 60, lines 2-25).

99.    In 2018 and 2019, Rayford was charged with the following criminal felony charges:  2018 CF 1176 (Aggravated Battery/Nurse); 2018 CF 1199 (Aggravated Battery Peace Officer/Correctional Employee); 2019 CF 226 (Aggravated Battery/Peace Officer/Correctional Officer/Firefighter); 2019 CF 230 (Aggravated Battery/Peace Officer); and 2019 CF 768 (Aggravated Battery of Peace Officer).  (McLean County Public Access, last accessed on October 31, 2023; Ex. 28, p. 1-3).

100.    The behaviors included impulsive or poorly modulated actions while in custody and in court, including on June 26, 2019.  (Ex. 28; Ex. 18, Latasha dep., p. 94, lines 1-25, p. 95, lines 1-25, p. 96, lines 1-14, p. 106, lines 16-21).

101.    These unlawful behaviors and the resulting criminal charges resulted in

Rayford being detained in the Jail from November 11, 2018 to November 28, 2018,

March 1, 2019 to March 24, 2019 and from June 26, 2019 to August 14, 2019 when he

transferred to the custody of the Department of Human Services, Chester Mental Health

Center. (Ex. 2, Hughes Decl., ¶ 60; Ex. 18, Latasha dep., p. 51, lines 17-25, p. 52, lines 1-

13, p. 53, lines 1-25, p. 54, lines 1-25, p. 55, lines 1-24).

102.    Rayford had a history of aggressive and dangerous behavior while in

custody of the Jail which required correctional staff to take additional precautions to

ensure the safety and security of Rayford, other inmates and the correctional and

medical staff when interacting with Rayford.  (Ex. 2, Hughes Decl., ¶ 61; Jackie Mathias

Report attached as Exhibit 40).

103.    During his time in custody at the Jail, Rayford engaged in aggressive and

dangerous behavior including:  11/12/2018 throwing a cup full of urine and feces at a

correctional officer (MC 1120); 03/02/2019 throwing his food trays, threatening to kill a

correctional officer and throwing urine in a cup at the same correctional officer (MC

1270); 03/03/2019 refusing to comply with orders; 03/04/19 for "cheeking" his

medication (MC 01283); 03/07/2019 throwing his food tray at the booking counter (MC

1285);  03/14/2019 threatening to commit suicide (MC 1289); 03/18/2019 throwing a

drink out of his chuckhole towards officers (MC 1293); 07/23/2019 refusing to lock up,

attempting to dump tea on an officer, threatening to hit an officer, making threatening

statements (MC 1401-1402); 07/24/2019 having at "shank" hidden on his person while

being escorted by officers, taking other metal pieces from the shower in booking and

telling another inmate that "they won't charge me with anything else if I stab one of them" (MC 1405-1407); and 07/24/2019 assault and battery of a correctional officer (MC 1409). (Ex. 2, Hughes Decl. ¶ 62; Incident Reports attached as Exhibit 34).

104.    Due to Rayford's behavioral issues while in custody, Rayford often was housed in a single cell with frequent and staggered observation checks performed by correctional staff. (Ex. 2, Hughes Decl., ¶ 61; Ex. 14; Ex. 40).

105.    From November 2018 to August 24, 2019, Rayford had various medications prescribed by his outside doctors and those medications had changed over time. (Medical Records from 11/10/18-11/28/18 attached as Exhibit 31; Medical Records from 3/1/19 – 3/24/19 attached as Exhibit 32; Medical Records from 6/26/19 – 8/14/19 attached as Exhibit 33).

106.    Rayford had a history of non-compliance with medications that both pre-existed and postdated his detention at the Jail on June 26, 2019. (Ex. 20, Dr. Kohn's dep, p. 100, lines 9-18; Ex. 18, Latasha dep, p. 82, lines 3-23, p. 85, lines 13-14, p. 143, lines 11-25, p. 144, lines 1-4, p. 146, lines 7025, p. 147, lines 1-13).

107.    Rayford had a history of intractable seizures uncontrolled with medications that both pre-existed and postdated his detention at the Jail on June 26, 2019. (Ex. 28; Ex. 18, Latasha dep, p. 35, lines 1-18, p. 82, lines 3-23, p. 89, lines 1-11, p. 142, lines 21-25, p. 143, lines 1-6, p. 144, lines 5-25, p. 145, lines 1-6, p. 146, lines 7-25, p. 147, lines 1-23, p. 147, lines 24-25, p. 148, lines 1-10; Ex. 20, Dr. Kohn dep., p. 138, lines 21-24, p. 139, lines 1012, p. 158, lines 1-19; Deposition of LaVonte Rayford attached as Exhibit 19, p. 55, lines 22-25, p. 56, lines 1-20).

*Rayford's Fitness Hearing on June 26, 2019*

108.    On June 26, 2019, Rayford attended a scheduled court hearing between 2:00 PM – 3:00 PM at the McLean County Law & Justice Center on his pending criminal cases while out on bond.  (Ex. 18, Latasha dep., p. 68, lines 14-24; Declaration of Deputy David Fritts, attached as Exhibit 51, ¶ 3).

109.    Plaintiff was also present for the court hearing.  (Ex. 18, Latasha dep., p. 68, lines 14-24).

110.    Due to past incidents with Rayford and the expectation that he was to be ordered back into custody, deputies were present inside and outside the Courtroom for his hearing.  (Ex. 51, Fritts Decl., ¶ 4).

111.    At the hearing, the judge found Rayford unfit to stand trial and remanded him to the custody of the Department of Human Services.  (Ex. 51, Fritts Decl., ¶ 5; 6/26/19 Fitness Order attached as Exhibit 35).

112.    After the judge ordered Deputy Fritts to take Rayford into custody, Rayford leaned against the back doors of the Courtroom and Deputy Jayson Kessinger, who was stationed outside, had to prevent him from leaving. (Ex. 51, Fritts Decl., ¶ 6).

113.    Rayford grabbed a pen from his attorney and refused to put it down, giving deputies concern that he might use it as a weapon. (Ex. 51, Fritts Decl., ¶ 7).

114.    Deputy Fritts and Deputy Kessinger attempted to take Rayford into custody, but he pulled away, jumped over the half-wall separating the well of the court from the gallery, and then jumped up on the jury box.  (Ex. 51, Fritts Decl., ¶ 8).

115.    When Rayford came down, Deputy Fritts ordered him to turn and put his hands behind his back to be handcuffed or he would be tasered. Rayford refused and Deputy Fritts fired his taser, striking Rayford in the torso. Rayford was not immobilized and continued to refuse to comply. (Ex. 51, Fritts Decl., ¶ 9).

116.    Deputy Fritts then pulled the trigger on the taser to deliver another charge. Rayford again was not immobilized. Instead of complying with the officers' directions, Rayford ripped the taser probes out. (Ex. 51, Fritts Decl., ¶ 9).

117.    Other deputies arrived and Deputy Homan attempted to speak with Rayford to gain compliance. Rayford continued to refuse, forcing officers to use a takedown to get him onto the floor and handcuffed. (Ex. 51, Fritts Decl., ¶ 10).

118.    Plaintiff, who was present at the court hearing, initially refused to leave the courtroom until she could speak to Rayford, and was allowed to speak to him after Rayford was placed in the secure holding cell attached to the courtroom in an attempt to calm him down.  (Ex. 51, Fritts Decl., ¶¶ 11-12; Ex. 18, Latasha dep., 74, lines 4-10).

119.    Around the time Rayford was going to be transported from the courthouse to the Jail, deputies relayed to jail staff that they were bringing down an uncooperative inmate for booking.  (Ex. 2, Hughes Decl., ¶ 63; Sergeant's Reports attached as Exhibit 36, MC 01373).

120.    There was a delay in moving Rayford from the secure courtroom holding cell to the Jail for processing as additional officers were needed to assist.  (Ex. 51, Fritts Decl., ¶ 13).

121.    Additionally, because Rayford was secured in the holding cell at the time, deputies waited to transfer him to the Jail for processing until the Jail had a place to secure him once taken into custody.  (Ex. 51, Fritts Decl., ¶ 13).

*Rayford Processed and Booked in the Jail on June 26, 2019 and June 27, 2019*

122.    After the court hearing, Rayford was taken into custody and transferred by deputies to the Jail after 3:10 PM on June 26, 2019.  (Ex. 36, MC 01373; Field Arrest Report attached as Exhibit 37; Offender Booking Sheet attached as Exhibit 38).

123.    Due to Rayford's combative behavior in the courtroom, the booking process could not immediately be completed upon Rayford's arrival at the Jail.  (Ex. 2, Hughes Decl., ¶¶ 64-65; Ex. 18, Latasha dep., p. 94, lines 1-25, p. 95, lines 1-25, p. 96, lines 1-14; Ex. 23, Pacha dep., p. 20, lines 13-24, p. 21, lines 1-19; Ex. 24, Kerr dep., p. 37, lines 9-23; Ex. 25, Loftus dep., p. 55, lines 21-24, p. 56, lines 1-18).

124.    Instead, Rayford was pat searched for weapons and contraband, changed out and placed in a holding cell in the booking area of the Jail (Booking Cell #9) for observation and until the booking process could be completed.  (Ex. 2, Hughes Decl., ¶ 65; Ex. 18, Latasha dep., p. 94, lines 1-25, p. 95, lines 1-25, p. 96, lines 1-14; Ex. 23, Pacha dep., p. 20, lines 13-24, p. 21, lines 1-19; Ex. 24, Kerr dep., p. 37, lines 9-23; Ex. 25, Loftus dep., p. 55, lines 21-24, p. 56, lines 1-18).

125.    When Rayford arrived at the Jail, Officer Ken Pacha was one of two officers assigned to the booking area working second shift (3:00 PM – 11:00 PM) on June 26, 2019.  (Ex. 23, Pacha dep., p. 48, lines 8-16).

126.    After Rayford was secured in Booking Cell #9 at approximately 5:15 PM, frequent and staggered checks were conducted by correctional staff approximately every 10-15 minutes. (Ex. 2, Hughes Decl., ¶ 81; Isolation Logs from June 26, 2019 – June 27, 2019 attached as Exhibit 41, MC 00377-00381).

127.    Correctional staff's observations of Rayford during the checks performed were documented in the Isolation Logs.  (Ex. 41).

128.    After being placed in the booking cell, at 5:45 PM, Jackie Mathias of Inmate Services met with Rayford as he was upset over the court hearing, had a long history of mental health treatment, a traumatic brain injury, and due to his previous behavior and problems while in custody.  (Ex. 40).

129.    Mathias assessed Rayford to have situational depression/anxiety and stress reaction.  During Mathias' assessment of Rayford, he reported compliance with his medications while in the community and stated that "he isn't on the bs any more" when asked about previous behavior and his ability to be safe with the jail staff.  (Ex. 40).

130.    Mathias noted that Rayford would remain housed in booking for observation at this time, counselors will follow up regularly, and medical staff will work to get medications verified and approved for Rayford.  (Ex. 40).

131.    Counseling Progress Notes are typically not accessible to correctional staff at the Jail, are not contained in the EJS system accessible by correctional staff, and there is no indication Mathais communicated any information pertaining to Rayford to correctional staff. (Ex. 24, Kerr dep., p. 61, lines 6-24, p. 62, lines 1-24, p. 63, lines 1-15).

132.     On June 26, 2019 in the evening after the jail nurses had left for the day,

Plaintiff arrived at the Jail and dropped off several bottles of Rayford's prescription

medications:  Divalproex, Phenytoin Sodium, Lamotrigine, and Topiramate. (Ex. 18,

Latasha dep., p. 74, lines 13-25, p. 75, lines 1-25, p. 76, lines 1-9, p. 90, lines 18-25, p. 91,

lines 1-2, 15-25, p. 92, lines 1-24; Ex. 23, Pacha dep., p. 54, lines 1-18; Handwritten

Property Receipt completed by Pacha attached as Exhibit 42).

133.     According to Plaintiff, at the time she gave the medications to Officer

Pacha, she informed him that Rayford was epileptic, that he needed to take his

medication that night, and that if he does not take it, he will have a seizure. (Ex. 18,

Latasha dep., p. 74, lines 13-25, p. 75, 1-25, p. 76, 1-9, p. 98, lines 11-25, p. 99, lines 1-25,

p. 100, line 1).

134.     Officer Pacha told Plaintiff that he would document that the medication

was dropped off for Rayford, that the nursing staff was gone for the day, that Health

Services would verify and approve the medication, generally explained to her the

verification and approval process to administer prescription medications brought in to

the Jail by a family member and explained that correctional staff could not administer

the medications because they are not medical staff. (Ex. 18, Latasha dep., p. 74, lines 13-

25, p. 75, lines 1-25, p. 76, lines 1-9; p. 90, lines 18-25, p. 91, lines 1-2, 15-25, p. 92, lines 1-

24, p. 98, lines 11-25, p. 99, lines 1-25, p. 100, line 1; Ex. 23, Pacha dep., p. 56, lines 6-24,

p. 57, lines 1-24, p. 58, lines 1-3).

135.     Officer Pacha then logged the medications dropped off by Plaintiff in a

handwritten Property Receipt as opposed to entering the information in the EJS system

because Rayford's booking had not yet been completed.  (Ex. 23, Pacha dep., p. 58, lines 4-24, p. 59, lines 1-24; Ex. 42).

136.   Officer Pacha next took the medication and placed it in the medication lockbox per policy for the jail nurses to pick up. (Ex. 23, Pacha dep., p. 63, lines 3-8; Ex. 42).

137.   It was Officer Pacha's practice to either email Health Services or call and leave a message for Health Services if medication was dropped off by a family member and the nurses were not on-site at the time and, to the best of his recollection, did one or other.  (Ex. 23, Pacha dep., p. 63, lines 9-24, p. 64, lines 1-17).

138.   According to Plaintiff, on June 26, 2019 between 8:30 PM and 9:00 PM, she called the Jail, spoke to a correctional officer, and requested that someone give Rayford the medication that she dropped off.  However, Plaintiff cannot identify who she spoke to when she called the Jail other than to indicate that it was a correctional officer.  (Ex. 18, Latasha dep., p. 101, lines 22-25, p. 102, lines 1-25, p. 103, lines 1-25, p. 104, lines 1-25).

139.   According to Plaintiff, the unidentified officer told her there was no medical staff available and to call back in the morning.  (Ex. 18, Latasha dep., p. 105, lines 19-23).

140.    On June 26, 2019, Sgt. Thomas Schroeder was assigned to Post #1 Sergeant for third shift (2300 – 0700) on June 26, 2019 and June 27, 2019, went in early at 1900 – 2300 for overtime on June 26, 2019 working Post #2 Booking, and was assigned

to Post #2 Booking, second shift (1500 – 2300) on June 27, 2019. (Declaration of Thomas Schroeder attached as Exhibit 53, ¶¶ 2-3).

141.    From 1900 – 2300 while assigned to Post #2 – Booking and not as the shift supervisor, Sgt. Schroeder conducted observation checks on inmates housed in the booking area and Schroeder had occasion to conduct observation checks of Rayford during this shift at 1945, 1956, 2018, 2044, 2131, and 2200 on June 26, 2019 and once while working as the Post #1 Sergeant for third shift at 0418.(Ex. 53, Schroeder Decl., ¶¶ 4, 7).

142.    During the observations checks of Rayford, Schroeder was not made aware of a need for medical attention or otherwise observed a need for medical attention. (Ex. 53, Schroeder Decl., ¶¶ 5-6).

143.    When Sgt. Schroeder came on shift in booking at 1900, he took steps to facilitate Rayford's booking process by logging in Rayford's information to complete the Field Arrest Form and Property Receipt in the EJS system and would have been aware at that time that medication had been dropped off and logged. (Ex. 53, Schroeder Decl., ¶ 8; Ex. 37; EJS Property Receipt attached as Exhibit 43).

144.    As the Watch Commander on third shift, Sgt. Schroeder would have been aware of the need to still complete Rayford's booking. (Ex. 53, Schroeder Decl., ¶ 9).

145.    Rayford was observed by several correctional officers working in the booking area during third shift on June 26, 2019 – June 27, 2019 during frequent and staggered checks. (Ex. 41).

146.   On June 27, 2019, Officer Raymond Loftus worked Post #2 in the booking area from 7:00 AM to 11:00 AM.  (Ex. 25, Loftus dep., p. 20, lines 10-24).

147.   After coming on shift in booking, Officer Loftus spoke to Rayford and was able to complete the remaining booking documents, including the Medical Screening Report.  (Ex. 25, Loftus dep., p. 31, lines 10-24, p. 32, lines 1-2; Ex. 45).

148.  Based on information provided by Rayford, the Medical Screening Report identified that Rayford required medication, that he reported having prescriptions for "topermain," "tomotramin," and other unknown medications, noted that Rayford was epileptic and identified that Rayford was under a physician's care, namely a Dr. Newmiester.  (Ex. 25, Loftus dep., p. 34, lines 16-24, p. 35, lines 1-24, p. 36, lines 1-24, p. 37, lines 1-23; Medical Screening Report attached as Exhibit 39).

149.   The Medical Screening Report is the last step of the booking process for an inmate, and once completed, an automatic electronic notification via the EJS system is sent to the Health Services staff so the jail nurses can follow up with an inmate with medical needs.  (Ex. 2, Hughes Decl., ¶¶ 27-28; Ex. 25, Loftus dep., p. 39, lines 9-24, p. 40, lines 1-24; Ex. 7, MC 00116; Ex. 8, MC 00110).

150.   The EJS system recorded that Officer Loftus completed Rayford's booking at or around 8:02 AM on June 27, 2019 at which time a notification was sent to medical via EJS indicating that Rayford needed medical attention and a copy of the Medical Screening Report was printed out and placed in Rayford's physical inmate file. (Ex. 25, Loftus dep., p. 39, lines 9-24, p. 40, lines 1-24; Ex. 45).

151.    On June 27, 2019 at approximately 8:02 AM, EJS recorded the Health Services unit received a notification in EJS indicating that Rayford required medical attention.  (Ex. 45; Record of Notification received reattached as Exhibit 46).

152.    A notification to Health Services via EJS would not have occurred absent the Medical Screening Report and booking process being completed.  (Ex. 17, Scott dep., p. 24, lines 12-24, p. 25, lines 1-9; Ex. 25, Loftus dep., p. 39, lines 14-24, p. 40, lines 1-23; Declaration of Thomas McCormick attached as Ex. 52, ¶¶ 10-11).

153.    According to the EJS system, Nurse Bonnie Brown viewed the notification at 10:25 AM on June 27, 2019 although Nurse Brown testified that she did not receive the notification. (Ex. 46; Ex. 21, Brown dep., p. 58, lines 2-10).

154.    On June 27, 2019 between 8:00 AM – 9:00 AM, Plaintiff dropped off another prescription medication for Rayford, Olanzapine, which was documented as having been received by Officer Loftus, placed in the locked medication box, and logged on the EJS generated Property Receipt Form.  (EJS Property Receipt Loftus attached as Exhibit 44; Ex. 25, Loftus dep., p. 47, lines 19-24, p. 48, lines 1-3).

155.    According to Plaintiff, on June 27, 2019 between 8:00 AM and 9:00 AM, she spoke to a Health Services staff member on the telephone and told her that Rayford had not received his evening dose of seizure medication on June 26th, and that he needs to take his morning dose of seizure medication as soon as possible, although she cannot identify who she spoke to during this call.  (Ex. 18, Latasha dep., p. 106, lines 22-25, p. 107, lines 1-25, p. 108, lines 1-25, p. 110, lines 1-4).

156.    According to Plaintiff, the unidentified jail nurse explained to her that the nursing staff cannot administer the medication without approval and orders from the jail physician and provided her with the Health Services fax number. (Ex. 18, Latasha dep., p. 106, lines 22-25, p. 107, lines 1-25, p. 108, lines 1-25, p. 110, lines 1-4).

157.    According to Plaintiff, she then called Rayford's treating physicians who knew Rayford's change in medication to provide verification of the medications to the Health Services staff.  (Ex. 18, Latasha dep., p. 106, lines 22-25, p. 107, lines 1-25, p. 108, lines 1-25, p. 110, lines 1-4).

158.    On June 27, 2019 at approximately 10:20 AM, Nurse Brown received a call from a Laura at Dr. Robert Hamilton's office (Rayford's psychiatrist) who inquired about Rayford receiving his prescription medication.  (Ex. 33, MC 00963; Ex. 21, Brown dep., p. 58, lines 11-24, p. 59, lines 1-15).

159.    Nurse Brown also reported that Laura was to fax over a list of Rayford's prescribed medications.  (Ex. 33, MC 00963).

160.    On June 27, 2019, at approximately 10:40 AM, Nurse Brown received a fax from Laura at Dr. Hamilton's office, providing an "Outpatient Medication List as of 6/18/19" and indicating a diagnosis of mood disorder as late effect of traumatic brain injury, and other psychotic disorder not due to substance or known physiological condition.  (Ex. 33, MC 00963; Ex. 21, Brown dep., p. 72, lines 9-23; Fax and Medication List attached as Exhibit 64).

161.    Nurse Brown recorded her communication with the nurse from Dr. Hamilton's office and documented that she would follow up with the jail physicians,

Dr. Lochard or Dr. Okuleye. (Ex. 33, MC 000963, Ex. 21, Brown dep., p. 72, lines 17-24, p. 73, lines 1-2).

162.    Correctional staff working in the booking area on June 27, 2019 during first shift continued to conduct observations checks on Rayford in Booking Cell #9 and did not observe any signs of distress until approximately 1:30 PM when an officer assigned as a float officer and helping out in the booking area, witnessed what was reported to be seizure like activity while Rayford was on a mat on the floor of his cell. (McLean County Jail Event Report – McNamara attached as Exhibit 47).

163.    McNamara immediately called control to advise that medical assistance was needed in Booking Cell #9.  (Ex. 47).

164.    Sergeant Thomas McCormick, Officer David Starr, Officer Tyler Wahls, and Officer Tanner Boyle responded to provide assistance, and nurses Suzanne Scott and Teresa Cirks immediately responded to provide medical assistance.  (Ex. 47; Ex. 33, MC 00963-00964; Ex. 17, Scott dep., p. 60, lines 7-24, p. 61, lines 1-24, p. 62, lines 1-7; Deposition of Teresa Cirks attached as Exhibit 27, p. 42, lines 8-14).

165.    In responding, nurses Scott and Cirks assessed Rayford's reported seizure within the standard of care.   Their evaluation indicated that Rayford was not unconscious or paralyzed and was able to reposition himself without assistance. Rayford was placed on the floor on mats to protect him in the event of another seizure. (Ex. 33, MC 00963-000964; Ex. 47; Declaration and Report of Kathryn J. Wild attached as Exhibit 29, ¶ 8).

166. After conducting their assessment of Rayford, nurses Scott and Cirks determined that he did not need to go out for any further medical attention but would continue to monitor. (Ex. 33, MC00964; Ex. 47; Ex. 17, Scott dep., p. 65, lines 8-24, p. 66, lines 1-24, p. 67, lines 1-6; Deposition of Teresa Cirks attached as Exhibit 27, p. 44, lines 6-16).

167. According to Nurse Scott, she then took action to investigate whether Rayford needed seizure medication by looking in the EJS system, OSF elinks, and Rayford's physical medical file. (Ex. 17, Scott dep., p. 70, lines 17-24, p. 71, lines 1-24).

168. Officer Devon Swart was posted in booking for the 1500 -2300 shift at 3:13 PM when he observed Rayford lying on the floor in the middle of a reported seizure. Officer David Starr responded and called for medical assistance at 3:14 PM. (McLean County Incident Report 201908376 attached hereto as Exhibit 49, MC 00461; Declaration of Devon Swart attached as Exhibit 58, ¶¶ 4,9; Declaration of David Starr attached as Exhibit 62, ¶ 9; Declaration of Timothy Mann attached as Exhibit 56, ¶ 8).

169. Nurses Nancy Griffin and Kathy Murphy responded to the reported seizure and conducted an assessment within the standard of care. They took vital signs and assessed his condition, indicating they would make calls to the jail physician as they were currently trying to get medication approved and that they would continue to monitor. (Ex. 49, MC 00461, Ex. 33, MC 00964; Deposition of Kathy Murphy attached as Exhibit 26, p. 45, lines 5-24, p. 46, lines 1-24, p. 47, lines 1-24, p. 48, lines 1-17; Deposition of Nancy Griffin attached as Exhibit 22, p. 53, lines 21-24, p. 54, lines 1-18; Exhibit 29, Wild Decl., ¶ 9).

170.     According to the progress notes, Nurse Griffin received telephone orders from Dr. Lochard on June 27, 2019 at 3:30 PM for Prolax sodium, topiramate, and phenytoin sodium ("Dilantin") to be administered to Rayford.  (Ex. 33, MC 00965; Ex. 22, Griffin dep., p. 59, lines 4-17; Exhibit 29, ¶ 9).

171.     Before Dr. Lochard's orders could be implemented, it was reported at 3:55 PM by Officer Mann that Rayford was having another seizure, had hit his head, and medical assistance was called.  (Ex. 49, MC 00461; Ex. 33, MC 00964-00965; Ex. 56, Mann Decl., ¶ 9; Ex. 29, Wild Decl., ¶ 10).

172.     Nurse Scott responded again with nurse Griffin at 3:57 PM, assessed Rayford, noted a bump over his right eyebrow, and directed that he be sent to the hospital by ambulance, acting within the standard of care. (Ex. 49, MC 00461; Ex. 33, MC 00964-00965; Ex. 56, Mann Decl., ¶ 11; Ex. 29, Wild Decl., ¶ 10; Ex. 22, Griffin dep., p. 57, lines 12-24, p. 58, lines 1-8).

173.     Rayford was evaluated and treated at the OSF emergency room on June 27th for a few hours and was discharged back to custody later that same evening.  (Kerr email attached as Exhibit 50; Declaration and Report of Johnny E. Bates, M.D. attached as Ex. 30, ¶ 8; Ex. 36, MC 1378-1379).  There is no indication that if Rayford would have received his medication either the evening of June 26th or the morning of June 27th that he would not have suffered a seizure on June 27th.  (Ex. 20, Dr. Kohn dep., p. 167, lines 17-24, p. 168, line 1).

174.     Rayford suffered a hematoma as a result of a fall during the third episode, as evidenced by the fact that he was released from the hospital and returned to the Jail a

short time later.  He did not suffer any long-term sequelae from this event.  (Ex. 30, Dr. Bates Decl., ¶ 8).  According to Rayford, he suffered no physical or mental limitations due to the hematoma.  (Ex. 19, LaVonte dep., p. 55, lines 13-21)

175.    Rayford remained in custody at the Jail until August 14, 2019 when he was transferred to Chester Mental Health Center.[1]  (Ex. 18, Latasha dep., p. 28, lines 10-20).  Rayford has no recollection of any specific interactions with Health Services staff, correctional staff, Inmate Services or medical care on June 26 or June 27, and does not recall taking medication the morning of June 26th or when he last took it.  (Ex. 19, LaVonte dep., p. 35, lines 2-5, p. 36, lines 3-7, p. 37, lines 10-19, p. 38, lines 6-15, 20-24, p. 39, lines 1-9, 16-19, p. 46, lines 19-25, p. 47, lines 1-20).

176.    The episode suffered by Rayford at 1:30 PM on June 27 was a psychological non-epileptic seizure and not a true epileptiform seizure and that the 3:20 PM episode was also most likely a non-epileptic seizure.  The final episode prior to hospitalization is less clear and could be an epileptiform seizure or non-epileptic seizure. (Ex. 30, Dr. Bates Decl., ¶¶ 5-6).

177.    The Jail's policies for verification and administration of medication are typical of what is seen in correctional medicine and within the standard of care. (Ex. 30, Dr. Bates Decl., ¶ 7).

178.    Medications should be verified and approved by the jail physician prior to administration to ensure that the medications are appropriate for the patient at that

---

[1] Plaintiff has a case pending in the Southern District of Illinois against Chester Mental Health Center and several of its employees related to his detention there in August 2019 claiming that Lavonte was "over medicated" with seizure medications.

time and that there are no contraindications for the medications being provided.  These policies are consistent with recommendations of the National Commission on Correctional Healthcare.  (Exhibit 30, Dr. Bates Decl., ¶ 7).

### *Officer Scott Kerr*

179.    Officer Kerr was on duty as the Watch Commander for second shift on June 26, 2019, worked four (4) hours overtime from 11:00 PM to 3:00 AM in the booking area, and was again the Watch Commander for second shift on June 27, 2019.  (Ex. 24, Kerr dep., p. 10, lines 20-24, p. 11, lines 1-11, p. 12, lines 17-24, p. 13, lines 1-4, p. 14, lines 17-24, p. 15, line 1).

180.    Officer Kerr had contact with Rayford while conducting observation checks and observed him at 2302, 2316, 2330, 0044, and 0058, 0113, 0126, 0204, 0218, 0232 and 0245 and did not observe Rayford to be any medical distress. (Ex. 24, Kerr dep., p. 54, lines 17-24, p. 55, lines 1-14; Ex. 41).

181.    Officer Kerr provided security and standing by while the nursing staff was providing assessment and care to Rayford on June 27, 2019 during at least two of the calls for medical assistance.  (Ex. 24, Kerr dep., p. 64, lines 3-24, p. 65, lines 1-22).

### *Officer David Starr*

182.    Officer Starr worked Post #7 Booking/Float from 0700-1500 and Post #3 Booking from 1500-1900 on June 27, 2019. (Ex. 62, Declaration of David Starr, ¶ 3).

183.    On June 27, 2019, Officer Starr had contact with Rayford while conducting observation checks and observed him on several occasions as documented in the Isolation Logs. (Ex. 62, Starr Decl., ¶¶ 3, 6).

184.    Officer Starr first became aware of Rayford having medical issues when he responded to Booking Cell #9 at approximately 1330 on June 27, 2019. (Ex. 62, Starr Decl., ¶ 8).

185.    Officer Starr did not participate or have any involvement in processing Rayford's booking or intake on either June 26, 2019 or June 27, 2019. (Ex. 62, Starr Decl., ¶ 11).

186.    Officer Starr did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 62, Starr Decl., ¶ 12).

187.    Officer Starr's contact with Health Services on June 27, 2019 pertaining to Rayford was limited to his contact with the jail nurses who responded to the two calls for medical assistance to Rayford's cell and on each occasion, deferred to the nurses' assessment. (Ex. 62, Starr Decl., ¶¶ 13-14).

188.    Officer Starr was not aware that Rayford had a need for medical attention until after responding to the calls for assistance to his cell.  By that time, Rayford was under the care of Health Services who indicated that they were working to get his medications verified and approved.  (Ex. 62, Starr Decl., ¶ 15).

### *Officer Nicholas Hitchins*

189.    Officer Nicholas Hitchins worked Post #3 in the booking area of the Jail from 0300-0700 on June 27, 2019.  (Declaration of Nicholas Hitchins attached as Exhibit 59, ¶¶ 3-4).

190.    During his shift, Officer Hitchins had contact with Rayford while conducting observations checks on inmates in booking and observed Rayford in his cell at 0300, 0313, 0327, 0342, 0431, 0500, 0514, 0526, 0540, and 0554 on June 27, 2019, was not made aware of need for medical attention or otherwise observed any behavior to indicate a need for medical attention.  (Ex. 59, Hitchins Decl., ¶¶ 5-7).

191.    Officer Hitchins did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019. (Ex. 59, Hitchins Decl., ¶ 8).

192.    Officer Hitchins did not have any contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from either Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford. (Ex. 59, Hitchins Decl., ¶ 9).

193.    Officer Hitchins was not aware on either June 26, 2019 or June 27, 2019 that prescription medication had been dropped off by Latasha Rayford on June 26, 2019 or June 27, 2019.  (Ex. 59, Hitchins Decl., ¶ 10).

### Officer Jennifer Reuter

194.    Officer Jennifer Reuter worked Post #3 in the booking area of the Jail from 1500 – 1900 on June 26, 2019.  (Declaration of Jennifer Reuter attached as Exhibit 54, ¶¶ 3-4).

195.    On June 26, 2019, Officer Reuter had contact with Rayford while conducting observation checks and observed him at 1745, 1800, 1814, and 1828, was not

made aware of need for medical attention or otherwise observed any behavior to indicate a need for medical attention.  (Ex. 54, Reuter Decl., ¶¶ 5-7).

196.    Officer Reuter did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019.  (Ex. 54, Reuter Decl., ¶ 8).

197.    Officer Reuter did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias (with the exception of observing that Ms. Mathias was meeting with Mr. Rayford), or anyone from Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Mr. Rayford.  (Ex. 54, Reuter Decl., ¶ 9).

### *Officer Mary Schapmire*

198.    Officer Mary Schapmire worked Post #3 in the booking area of the Jail from 2300-0300 and Post 3 South from 0300-0700 on June 26, 2019 and June 27, 2019. (Declaration of Mary Schapmire attached as Exhibit 61, ¶¶ 3-4).

199.    During Officer Schapmire's shift in booking from 2300-0300, she had contact with Rayford while conducting routine observation checks and observed him at 2345, 2400, 0015 and 0030, was not made aware of a need for medical attention or otherwise observed any behavior to indicate a need for medical attention.  (Ex. 61, Schapmire Decl., ¶¶ 5-7).

200.    Officer Schapmire did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019.  (Ex. 61, Schapmire Decl., ¶ 8).

201.    Officer Schapmire did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias or anyone from Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Mr. Rayford.  (Ex. 61, Schapmire Decl., ¶ 9).

202.    Under the circumstances, Officer Schapmire would have no reason to access EJS or Rayford's inmate file during her shift. (Ex. 61, Schapmire Decl., ¶¶ 10-13).

### *Officer Michael Mays*

203.    Officer Michael Mays worked Post #2 in the booking area of the Jail working from 1900-2300 on June 27, 2019.  (Declaration of Michael Mays attached as Exhibit 63, ¶¶ 3-4).

204.    Officer Mays does not recall having any contact with Rayford during his shift, but if he did, any contact would have been during observations checks conducted on Rayford after his return from the hospital based on the hours worked.  (Ex. 63, Mays Decl., ¶ 5).

205.    Officer Mays did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019.  (Ex. 63, Mays Decl., ¶ 6).

206.    Officer Mays did not have any contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Mr. Rayford.  (Ex. 63, Mays Decl., ¶ 7).

### Officer Sarah Buhlig

207.    Officer Sarah Buhlig worked Post #3 in the booking area of the Jail from 0700-1100 on June 27, 2019.  (Declaration of Sarah Buhlig attached as Exhibit 57, ¶¶ 3-4).

208.    Officer Buhlig had contact with Rayford while conducting routine observation checks and observed him at 0900, 1000, 1015, 1039 and 1045 on June 27, 2019, was not made aware of a need for medical attention or otherwise observe any behavior to indicate a need for medical attention.  (Ex. 57, Buhlig Decl., ¶¶ 5-7).

209.    Officer Buhlig did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019.  (Ex. 57, Buhlig Decl., ¶ 8).

210.    Officer Buhlig did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias or anyone from Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Mr. Rayford.  (Ex. 57, Buhlig Decl., ¶ 9).

211.    Under the circumstances, Officer Buhlig would have no reason to access EJS or Rayford's inmate file during her shift. (Ex. 57, Buhlig Decl., ¶¶ 10-13).

### Officer Devon Swart

212.    Officer Devon Swart worked Post #3 in the booking area of the Jail from 1100-1500 and Post #4 in the booking areas of the jail from 1500-2300 on June 27, 2019. (Officer Swart Declaration attached as Exhibit 58, ¶¶ 3-4).

213.    Officer Swart had contact with Rayford while conducting routine observation checks and observed him on several occasions on June 27, 2019.  (Ex. 58, Swart Decl., ¶ 6).

214.    Officer Swart first became aware of Rayford having medical issues due to his involvement in a call for assistance to Rayford's cell at approximately 1330 on June 27, 2019.  (Ex. 58, Swart Decl., ¶ 8).

215.    Officer Swart did not participate or have any involvement in processing Rayford's booking or intake on either June 26, 2019 or June 27, 2019. (Ex. 58, Swart Decl., ¶ 11).

216.    Officer Swart did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 58, Swart Decl., ¶ 12).

217.    Officer Swart's contact with Health Services on June 27, 2019 pertaining to Rayford was limited to his contact with nurses who responded to the calls for medical assistance to Rayford's cell and on each occasion, deferred to the nurses' assessment. (Ex. 58, Swart Decl., ¶¶ 13-15).

### Officer Tim Smith

218.    Officer Tim Smith worked Post #4 in the booking area of the Jail working from 1900-2300 on June 26, 2019.  (Declaration of Tim Smith attached as Ex. 60, ¶¶ 3-4).

219.    Officer Smith had contact with Rayford while conducting routine observation checks and observed him several times, was not made aware of a need for

medical attention or otherwise observed any behavior to indicate a need for medical attention.  (Ex. 60, Smith Decl., ¶¶ 5-7).

220.    Officer Smith did not participate or have involvement in processing Rayford's intake or booking on either June 26, 2019 or June 27, 2019.  (Ex. 60, Smith Decl., ¶ 8).

221.    Officer Smith did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias or anyone from Health Services or Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 60, Smith Decl., ¶ 9).

### *Officer Timothy Mann*

222.    Officer Timothy Mann worked Post #8 2 South from 0700 -1500 on June 27, 2019 and Post #2 in the booking area of the Jail from 1500-1900.  (Timothy Mann declaration attached as Exhibit 56, ¶¶ 3-4).

223.    During his shift in booking, Officer Mann likely conducted observation checks on inmates housed in booking, however, the Isolation Logs indicate that Officer Mann did not conduct any routine observation checks on Rayford.  (Ex. 56, Mann Decl., ¶ 5).

224.    Officer Mann first became aware of Rayford having medical issues due to his involvement in a call for assistance to Rayford's cell at approximately 1513 on June 27, 2019 and was also involved in the call for assistance at 1555. (Ex. 56, Mann Decl., ¶¶ 8-9).

225.    Officer Mann did not participate or have any involvement in processing Rayford's booking or intake on either June 26, 2019 or June 27, 2019. (Ex. 56, Mann Decl., ¶ 12).

226.    Officer Mann did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 56, Mann Decl., ¶ 13).

227.    Officer Mann's contact with Health Services on June 27, 2019 pertaining to Rayford was limited to his contact with the nurses who responded to the calls for medical assistance to Rayford's cell and on each occasion, deferred to the nurses' assessment. (Ex. 56, Mann Decl., ¶¶ 14-18).

*Officer Tyler Wahls*

228.    Officer Tyler Wahls worked Post #4 in the booking area of the Jail from 1500-1900 on June 26, 2019.  (Declaration of Tyler Wahls attached as Exhibit 55, ¶¶ 3-4).

229.    Officer Wahls worked Post #2 in the booking area of the Jail from 1100 - 1500 and as a float officer from 1500 – 2300 on June 27, 2019.  (Ex. 55, Wahls Decl., ¶¶ 3-4).

230.    Officer Wahls had contact with Rayford on June 27, 2019 during his 1100-1500 shift while conducting routine observation checks and observed him at 1200, 1215, and 1230 and during that time was not made aware of a need for medical attention or otherwise observe any behavior to indicate a need for medical attention.  (Ex. 55, Wahls Decl., ¶¶ 6-8)

231.    Officer Wahls first became aware of Rayford having medical issues due to his involvement in a call for assistance to Rayford's cell at approximately 1330 on June 27, 2019.  (Ex. 55, Wahls Decl., ¶¶ 9-10).

232.    Officer Wahls did not participate or have any involvement in processing Rayford's booking or intake on either June 26, 2019 or June 27, 2019. (Ex. 55, Wahls Decl., ¶ 12).

233.    Officer Wahls did not have contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 55, Wahls Decl., ¶ 13).

234.    Officer Wahls' contact with Health Services on June 27, 2019 pertaining to Rayford was limited to his contact with the nurses who responded to the calls for medical assistance to Rayford's cell and on each occasion, deferred to the nurses' assessment. (Ex. 55, Wahls Decl., ¶¶ 14-17).

### Sergeant Thomas McCormick

235.    Sergeant Thomas McCormick worked Post #3 in the booking area of the Jail from 0300 – 0700 on June 27, 2019 in a correctional officer capacity.  (Declaration of Thomas McCormick attached as Exhibit 52, ¶¶ 3-4).

236.    Sergeant McCormick worked Post #1 as the sergeant from 0700 -1500 on June 27, 2019.  (Ex. 52, McCormick Decl., ¶¶ 3-4).

237.    As the sergeant working Post #1, Sergeant McCormick was the watch commander for the first shift and was responsible for making officer assignments to posts and providing overall supervision of the correctional staff and jail operations.   As

watch commander, Sergeant McCormick would not have typically been present in the booking area and his contact with the inmate population would have been limited. (Ex. 52, McCormick Decl., ¶ 8).

238.    During Sergeant McCormick's shift from 0300-0700, he had contact with Rayford while conducting routine observation checks and observed Rayford several times, was not made aware of a need for medical attention or otherwise observe any behavior to indicate a need for medical attention.  (Ex. 52, McCormick Decl., ¶¶ 5-7).

239.    Sergeant McCormick did not have any direct contact with Rayford or direct involvement in processing Rayford's intake or booking on June 26, 2019 or June 27, 2019, although he would have been aware that Rayford's booking process had been completed by Officer Loftus at or around 8:02 AM on June 27.   (Ex. 52, McCormick Decl., ¶¶ 9-11).

240.    As the watch commander, Sergent McCormick was involved in the assistance call to Rayford's cell at approximately 1330. (Ex. 52, McCormick Decl., ¶ 12).

241.    Sergeant McCormick did not have any contact with Latasha Rayford, Dr. Robert Hamilton's office, Jacqueline Mathias, or anyone from Inmate Services on either June 26, 2019 or June 27, 2019 regarding Rayford.  (Ex. 52, McCormick Decl., ¶ 16).

242.    Sergeant McCormick's contact with Health Services on June 27, 2019 pertaining to Rayford was limited to his contact with the nurses who responded to the calls for medical assistance to Rayford's cell and on each occasion, deferred to the nurses' assessment. (Ex. 52, McCormick Decl., ¶¶ 12-16).

III.    ARGUMENT

    **A.  Summary Judgment Standard**

    At summary judgment, the nonmovant plaintiff must provide evidence that, when viewed in the light most favorable to him, suffices to prove every element of his claim for which he bears the burden of proof.  *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir 2019).  However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007).  If the plaintiff fails to show at least a triable issue on each element, summary judgment is properly entered for the defendants.  *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

    **B.  Officers Schroeder, Reuter, Pacha, Wahls, Smith, Kerr, McCormick, Schapmire, Hitchins, Swart, Mann, Starr, Buhlig and Mays are entitled to summary judgment because their conduct was not objectively unreasonable.**

    Rayford brings a § 1983 claim, alleging that officers Schroeder, Reuter, Pacha, Wahls, Smith, Kerr, McCormick, Schapmire, Hitchins, Buhlig, Swart, Mann, Starr and Mays failed to provide him with adequate medical care while housed in Booking Cell #9 on June 26 from approximately 3:10 PM to June 27 at approximately 4:00 PM, over a 24-hour period of time.  Because Rayford was in custody after a finding of probable cause but had not been convicted of any crime, at issue are Rayford's Fourteenth Amendment rights, not Fourth Amendment rights as Plaintiff asserts.  *Jump v. Vill. of Shorewood*, 42 F.4th 782, 792-93 (7th Cir. 2022); *Pulera v. Sarzant,* 966 F.3d 540, 549 (7th Cir. 2020).  Jail and prison officials must take reasonable measures to guarantee the safety of detainees.  *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*,

511 U.S. 825, 832 (1994)).  Under the Fourteenth Amendment, the defendant officers' conduct is assessed using the objective reasonableness standard.  *Jump*, 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 550); see *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2019) (medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject to the objective reasonableness inquiry).

To prove that the officers failed to provide reasonable medical care, plaintiff must show that defendants acted purposefully, knowingly, or recklessly.  *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353).  If defendants were "aware that their actions would be harmful, then they acted purposefully or knowingly; if they were not necessarily aware but nevertheless strongly suspected that their actions would lead to harmful results, then they acted recklessly." *Pittman by and through Hamilton v. Cnty. of Madison*, 970 F.3d 823, 828 (7th Cir. 2020). Plaintiff must also show that the challenged conduct was objectively unreasonable. *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 354).

A court evaluating the reasonableness of medical care considers all of the facts and circumstances faced by the individual alleged to have provided inadequate care and, without considering the subjective beliefs held by that individual, whether the response was reasonable.  *Id.*; *Jump*, 42 F.4th at 793.  In assessing the reasonableness of a response, relevant factors include (1) notice of the arrestee's medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment (balanced against the seriousness of the need); and (4) police interests, including administrative, penological, and investigatory concerns.  *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594,

600 (7th Cir. 2011) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403-04 (7th Cir. 2007)) (applying the objective reasonableness test in the context of a Fourth Amendment medical-care claim); *Pulera v. Sarzant*, 966 F.3d 540, 552 (7th Cir. 2020) (citing *Williams*, 509 F.3d at 403 (discussing the factors in a case involving medical-care claims arising under either the Fourth or Fourteenth Amendments).

Objective unreasonableness under the Fourteenth Amendment cannot be shown through the actions of a cumulative group as Rayford attempts to do here. See *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002) (applying to claim for deliberate indifference). Instead, each named member of the group must be shown to have acted, independently, objectively unreasonable. Here, Rayford asserts that because all officers were assigned to booking duty during the time Rayford was in custody between his initial booking and his transport to the hospital following the seizures, these officers acted unreasonably in not providing Rayford with his seizure medication or medical care following the first two seizures. (Pl.'s Amended Compl., at 40, 48-49). However, with the exception of identifying Officer Schroeder as having confiscated Rayford's seizure medication and not contacting Rayford's physician to verify that he needed to take his seizure medication, Plaintiff has failed to identify how each of these officers had notice of a serious medical need or had any involvement in Rayford's medical care.

Plaintiff fails to establish that each officer was aware of a medical need other than to say that they should have been aware by the simple fact that they worked in booking during the timeframe in question and because Rayford was reported to be epileptic and had medical problems during a prior incarceration in March 2019.

51

Moreover, Plaintiff fails to identify how each officer was involved in Rayford's medical care during the calls to Rayford's cell or otherwise.

i.    **Officers Hitchins, Reuter, Mays, Buhlig, Smith, Schapmire, and Kerr Were Not Personally Involved in Rayford's Intake and Booking or in Providing Healthcare to Rayford and Therefore Cannot Incur Any Section 1983 Liability.**

Plaintiff cannot attribute any alleged unconstitutional misconduct to Officers Hitchins, Schapmire, Reuter, Mays, Buhlig, Smith, or Kerr.  There is no evidence that these defendants had any direct contact with Rayford's intake and booking, Plaintiff, receipt of any prescription medication, calls to Rayford's cell or were personally involved in Rayford's healthcare.  (Defs' UMF ¶¶ 180, 190-193, 195-197, 199-202, 204-206, 208-211, 219-221).  With the exception of Mays who had no direct contact with Rayford at all, the only involvement attributable to these officers is that they happened to be working in the booking area of the Jail at some point during the 24-hour period at issue and conducted observation checks on Rayford while housed in the booking cell. And the record clearly reveals that Rayford was not exhibiting any signs of being in medical distress at the time of the checks, that Rayford did not inform these officers of a need for medical attention, or that they were otherwise made aware of such a need.  *Id*.

Officers Hitchins, Schapmire, Reuter, Mays, Buhlig, Smith, or Kerr did not observe or speak to Latasha Rayford or were made aware of Rayford's medical condition, need for seizure medication or that it had been dropped off at the Jail.  *Id*. Nor did these officers participate in any decisions relating to Rayford's housing or medications or the medical calls on June 27th to Rayford's cell (with the exception of

Kerr who provided security and standing during a call).  *Id*.  And Rayford presents no

evidence to suggest that these officers were ever made aware that Rayford needed

seizure medication or that his mother had dropped the medication off at the jail.  To the

contrary, the officers' interaction with Rayford revealed no outward signs of a medical

emergency or need for medical care.  *Id*.

Officers may only be held constitutionally liable if they participated in the

alleged violation.  "Section 1983 creates a cause of action based on personal liability and

predicted on fault; thus, liability does not attach unless the individual defendants

caused or participated in a constitutional deprivation."  *Vance v. Peters*, 97 F.3d 987, 991

(7th Cir. 1996).  Alleging claims against "all defendants" is also insufficient, a plaintiff

must specify how each defendant was involved in the violation.  *Brown v. Ill. Dep't of

Pub. Aid*, 318 F. Supp. 2d 696, 700 (N.D. Ill. 2004) (dismissal when "allegations of

unequal treatment [were] made generally against all defendants, [and] fail[ed] to allege

the element of personal involvement necessary for individual liability under § 1983);

*Heartland Consumer Products LLC v. DineEquity, Inc.*, 2018 WL 465 784, at *4 (S.D. Ind.

Jan. 18, 2018) ("each defendant is entitled to know what he or she did that is asserted to

be wrongful).

After having the benefit of discovery, Plaintiff still does not identify how these

officers were made aware of an immediate need for medical attention other than to say

they "knew or should have known LaVonte suffered from an objectively serious

medical condition".  Pl's MSJ, p. 27-28.  However, at no point did Rayford make them

aware of such a need during observations checks and they did not participate in

Rayford's intake and booking.  At no point were Officers Hitchins, Schapmire, Reuter, Mays, Buhlig, Smith, or Kerr asked to assess or treat Rayford, nor were they ever informed that prescription medications had been dropped off for Rayford.  On the contrary, they conducted required observation checks of Rayford and appropriately documented such checks.  The mere fact that a detention officer was clocked in at the Jail and working in booking while Rayford was housed there is not enough to impose individual liability for a claim under Section 1983.  As the Seventh Circuit has noted, "liability is personal."  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

There is no evidence these officers were personally involved in Rayford's booking other than conducting routine wellness checks with no observable signs that Rayford was in medical distress, or his medical care.  *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019) ("In an action under section 1983, the plaintiff must establish individual liability…Thus, [the plaintiff] must be able to establish [the defendant's] personal involvement in the alleged constitutional deprivation.") (cleaned up); *William v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (individual defendants cannot be held liable under section 1983 unless they had some personal involvement in the alleged deprivation).

Officers Hitchins, Schapmire, Reuter, Mays, Buhlig, Smith, and Kerr are entitled to summary judgment because, construing the designated evidence in the Plaintiff's favor, no jury could conclude these officers acted objectively unreasonably, let alone purposefully, knowingly, or recklessly based on the information known to them at the time and they were not involved in Rayford' medical care or any alleged denial thereof.

54

ii.    **Officers Starr, Wahls, Swart, Mann, McCormick, Schroeder and Pacha are Entitled to Summary Judgment Because Their Conduct Was Not Objectively Unreasonable and They Are Entitled to Rely on the Medical Staff.**

Despite the change in the Fourteenth Amendment analysis governing claims of a pretrial detainee for denial care, one legal proposition remains unchanged. "When detainees are under the care of medical experts, non-medical staff may generally trust the professionals to provide appropriate medical attention." *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). Before the Court addressed the liability of medical personnel in *Miranda*, it analyzed the plaintiff's claim that jail personnel were deliberately indifference giving rise to a claim under the due process clause:

> "We need not delve into the nuances of the standard for such a claim because the Estate faces an insurmountable hurdle independent of that standard. We have long recognized the fact that correctional institutions (like most entities in a modern economy) engage in the division of labor. When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. We will not find a jail official to have acted with deliberate indifference (900 F.3d at 343) (emphasis added)."

This Court has also recognized that non-medically trained jail personnel may defer to the judgment of medical personnel when an inmate is under the care of a nurse. *Riley v. Kolitwenzew*, 2015 WL 12752685 (C.D. Ill. 2015) (J. Bruce), aff'd 640 F.3d 505 (7th Cir. 2016); *Moore v. Kankakee County*, 2013 WL 62837 (C.D. Ill. 2013) (J. Bruce). The only exception exists "if jail officials had reason to know that their medical staff was failing to treat or inadequately treating an inmate, liability possible." *Miranda*, 900 F.3d at 343.

Here, the record contains no evidence that Officers Starr, Wahls, Swart, Mann, McCormick, Schroeder and Pacha acted with intent to deprive Rayford of care or that

they evidenced a reckless disregard for his health.  To the contrary, the prescription medications dropped off by Plaintiff were appropriately logged and placed in the nurses' locked medication box by Officer Pacha and, once on shift, Officer Schroeder took steps to facilitate Rayford's booking process by logging in Rayford's information to complete the Field Arrest Form and Property Receipt in EJS.  Rayford's intake and booking documents were completed by 8:02 AM on June 27 by Officer Loftus notifying Health Services staff of Rayford's medical screening report, and Health Services staff were contacted and provided assessment and care to Rayford in response to each reported seizure.  (Defs' UMF, ¶¶ 132, 134-137, 140-143, 147-151).  And such a response, deferring decisions regarding medical care and medications to Health Services staff, is reasonable.  *Diaz v. Godinez*, 693 Fed. Appx. 440, 444 (7th Cir. 2017) (officers "who are not part of the medical team have acted appropriately if they have referred the issue to medical staff who could be expected to address it.").

In this case, Rayford was under the care of Health Services both before and after the reported seizures.  Health Services staff were notified of Rayford's medical screening report, and decisions regarding medical care and medication were deferred to Health Services staff.  Rayford was screened by a correctional officer, Officer Loftus, using a questionnaire for medical and mental health concerns upon booking and any delay was attributable to Rayford arriving at the Jail in an uncooperative and combative state as had historically been the case.  (Defs' UMF, 102-104, 108-121, 123-124). This practice has been upheld by the Seventh Circuit as constitutional.  See *Estate of Novack es rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (use of screening

56

questionnaire by booking officers and training thereof were constitutionally adequate).

Additionally, there is no evidence that the officers acted unreasonably in referring Rayford's medical screening to Health Services staff, and relying on the care provided by medical professionals.  Even assuming, *arguendo*, that Plaintiff could prove that any lapse or delay in referring a need for medical attention to the Health Services Staff was attributable to Officer Pacha (who received and logged the medications dropped off by Plaintiff the evening of June 26th) or Officer Schroeder (who later entered the information in the EJS system), this amounts to mere negligence, and is insufficient to defeat summary judgment on her constitutional claim.  *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (failures in dispending medication exactly as prescribed constituted negligence, and did not amount to a constitutional claim); *Bruederle v. Louisville Metro*, 687 F.3d 771, 777 (6th Cir. 2012) (to the extent the booking officer incorrectly recorded answers or failed to contact the medical staff – that at most reflects negligent conduct).

On June 27th, nursing staff were contacted to provide medical assessment to each reported seizure, at 1:30 PM, 3:14 PM, and again at 3:55 PM.   It is undisputed that on each occasion, nursing staff conducted an appropriate medical assessment of Rayford.  Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official" does not establish the mental-state requirement for liability under section 1983.  *See Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. Jan. 29, 2019) (deliberate indifference); *Perry*, 872 F.3d at 458.

For the first reported seizure, Officers McCormick, Starr, Wahls and Boyle responded to provide assistance, and nurses Suzanne Scott and Teresa Cirks responded to provide medical assistance. In responding, nurses Scott and Cirks assessed Rayford's reported seizure within the standard of care. Their evaluation indicated that Rayford was not unconscious or paralyzed and was able to reposition himself without assistance. Rayford was placed on the floor on mats to protect him in the event of another seizure. After conducting their assessment of Rayford, nurses Scott and Cirks determined that he did not need to go out for any further medical attention but would continue to monitor him. (Defs' UMF, ¶¶ 162-166).

At 3:13 PM, Officer Swart observed lying on the floor in the middle of a reported seizure and Officer Starr responded calling for medical assistance at 3:14 PM. Nurses Nancy Griffin and Kathy Murphy responded to the reported seizure and conducted an assessment within the standard of care. They took vital signs and assessed Rayford's condition, indicating they would make calls to the jail physician as they were currently trying to get medication approved and that they would continue to monitor. (Defs' UMF, ¶¶ 168-169).

According to the progress notes, Nurse Griffin received telephone orders from Dr. Lochard on June 27, 2019 at 3:30 PM for Prolax sodium, topiramate, and phenytoin sodium ("Dilantin") to be administered to Rayford, but before Dr. Lochard's orders could be implemented, it was reported at 3:55 PM by Officer Mann that Rayford was having another seizure, had hit his head, and medical assistance was called. Nurse Scott responded again with nurse Griffin at 3:57 PM, assessed Rayford, noted a bump

58

over his right eyebrow, and directed that he be sent to the hospital by ambulance, acting

within the standard of care. .  (Defs' UMF, ¶¶ 170-173).

Given the nurses' attention to Rayford and declarations that he did not need to

go out for further medical attention, that they would continue to monitor him, they

would make calls to the jail physician and they were working on trying to get

medication approved did not make it obvious that the medical defendants were not

providing adequate care.  *See Hayes v. Snyder*, 546 F.3d 516, 527-28 (7th Cir. 2008)

(nothing "made it obvious that [plaintiff] might not be receiving adequate care").  That

nurses were present at the time is significant in establishing that these officers are

entitled to summary judgment.

*Estate of Perry v. Wenzel*, 872 F.3d 439 (7th Cir. 2017) remains the most illustrative

example of the medical deference rule.  There, summary judgment was affirmed for

correctional officers who received what they were told was a "combative prisoner."  *Id*.

at 449.  When the prisoner was brought to the correctional facility by the police, he was

in an alarming medical state.  *Id*.  Two correctional officers had to drag Perry into the

facility with the assistance of police officers, because Perry could not walk.  *Id*.  Perry's

medical information was sent to the Jail, but there was no evidence any correctional

officers had looked at them.  *Id*. at 456.  Perry was taken to and laid down on a bench in

a room where a number of correctional officers were present alongside a nurse who

happened to be in the room as well.  *Id*. at 449-50.  The officer noticed Perry was

bleeding from his face mask, was drooling, self-defecated, and at one point even

writhed off the bench, and fell onto the floor.  *Id*.  The nurse in the room, however, did

59

nothing, so neither did the correctional officers.  Eventually, another nurse showed up and assessed Perry from a distance – this nurse could tell "the minute she saw [Perry]" that something was wrong with him.  *Id*. at 450.  Without communicating this concern, the nurse left the room, leaving Perry alone with the other nurse and correctional officers.  *Id*.  Eventually, a nurse realized that Perry was not breathing, and he ultimately expired.

Despite these obvious signs of distress – signs so obvious that the examining nurse immediately knew something was wrong with Perry – the correctional officers who saw all of these symptoms (and even dragged Perry into the facility) were granted summary judgment.  *Id*. at 458.  Not only were they granted summary judgment, but only two sentences of substantive analysis was necessary:  "These officers were not medical professionals.  Therefore, they were entitled to rely on the nurses' professional judgment without section 1983 liability."  *Id*.

In *Arnett v. Bigelow*, 658 F.3d 742 (7th Cir. 2011) the plaintiff had a diagnosis of rheumatoid arthritis (RA), a chronic autoimmune disease that progressively destroys a person's joints.  Id. at 746.  The Plaintiff had a letter from his prison doctor stating that plaintiff needed Enbrel, a medication that reduces RA's progression.  *Id*. at 746-47.  The plaintiff showed objective evidence of pain in the form of swollen joints and the need to walk with a cane.  *Id*. at 747.  Officials refused plaintiff anti-inflammatory medication, the plaintiff's RA worsened, and he suffered permanent damage to his joints.  *Id*. at 753-54.  On summary judgment, the court concluded that non-medical defendants justifiably relied on the expertise of medical personnel.  *Id*. at 755.  "[I]f a prisoner is

under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id*. (citing *Greeno*, 414 F.3d at 656).

In *Riley*, this Court commented that even if an inmate had a serious medical condition, an "officer's prompt call to the nurse undermined 'any suggestion that he acted with the recklessness or malicious intent to sustain a deliberate indifference claim." (*Riley* at p. 7). And in *Moore*, this Court noted that the officers were not liable because "they were deferential to, and responsive to, the decisions, orders and opinions of Nurse Sangster, and the record does not show that they had reason to believe Sangster was mistreating or failing to treat plaintiff." *Moore* at p. 10.

Here, the officers are not medically trained and reasonably relied upon the medical professionals to assess and care for Rayford in response to reported seizure activity and to manage any need for prescription medication or medical care. Holding a non-medical jail official liable in a case where a detainee was under medical staff's care would strain this division of labor. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see, e.g. Bond v. Aguinaldo*, 228 F.Supp.2d 918, 920 (N.D. Ill. 2002).

Moreover, jail officials may reasonably expect that delegation will lead to a proper resolution of an issue. *Schneider v. County of Will*, 528 F. App'x 590, 593 (7th Cir. 2013). This delegation does not provide for the level of personal involvement required to find defendants liable. *Id*. The record reveals that the only involvement any of these officers had in Rayford's care was to refer him, or to communicate any concerns, to the appropriate medical professionals and otherwise be present when the nurses provided

assessment to Rayford in response to the two reported seizures.  As such, the correctional staff reasonably relied on the Health Services staff to determine the proper course of care for Rayford and themselves took no steps to contribute or detract from the treatment [he] received.  *McCann*, 909 F. 3d at 888.  Accordingly, if there was deficient medical care (which Defendants do not admit), none of the correctional staff are liable under Section 1983, because none were personally involved in providing that care.

### C. Officers Schroeder, Reuter, Pacha, Wahls, Smith, Kerr, McCormick, Schapmire, Hitchins, Swart, Mann, Starr, Buhlig and Mays are entitled to qualified immunity.

Qualified immunity shields officials from civil liability with the exception of "the plainly incompetent or those who knowingly violate the law."  *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018).  Once a qualified immunity defense is raised, the burden shifts to the plaintiff to show (1) a violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the alleged violation.  *Lesiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)).  To prove that a right was clearly established, a plaintiff can (1) identify a reasonably analogous case that articulates the right at issue and concerns a similar set of facts, or (2) demonstrate that the violation was so obvious that a reasonable person would necessarily have recognized that it violated the law.  *Id*. at 701-02 (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017).  *See Pearson v. Callaham*, 555 U.S. 223, 231 (2009) (the protection of qualified immunity applies to reasonable mistakes of law or fact);

*Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-07 (2001)).

As discussed in Section i. and ii., *supra*, Plaintiff has failed to demonstrate that any individual officer clearly violated Rayford's constitutional rights.  Further, even if Plaintiff established such a violation, there is not a closely analogous case that would have provided the officer fair warning that any of his or her alleged actions were unconstitutional.  Nor do the undisputed facts support any claim that their conduct was patently unconstitutional.  In fact, the record and case law reveal quite the opposite.  Accordingly, the correctional officers are entitled to qualified immunity and summary judgment should be granted in their favor.

> **D.**   **The Jail's policies, practices, and customs were not constitutionally inadequate, nor did they cause Rayford to suffer a constitutional deprivation.**

Under the familiar holding of *Monell v. Department of Social Services*, local governments can be held responsible for constitutional violations only when they themselves cause the deprivation of rights.  436 U.S. 658, 691-92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Time and again the Supreme Court has reinforced the strict prohibition against allowing principles of vicarious liability to establish municipal liability under § 1983.  *See id*. at 694-95, 98 S.Ct. 2018; see also *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997).

*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct.  A primary guardrail is the threshold requirement of a plaintiff showing that a municipal

policy or custom caused the constitutional injury. *See Monell*, 436 U.S. at 690-91, 98 S.Ct. 2018. The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor? *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017).

The Seventh Circuit has recognized three types of municipal action that can support municipal liability under section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Speigel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Inaction can also give rise to liability if it reflects the municipality's conscious decision not to take action." *Glisson*, 849 F.3d at 381.

Next, a plaintiff bringing a *Monell* claim against a municipality "must show that the policy or custom demonstrates municipal fault." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Municipal fault is easily established when a municipality acts, or directs an employee to act, in a way that facially violates a federal right. *Brown*, 520 U.S. at 404-05, 117 S.Ct. 1382. On the other hand, where the plaintiff does not allege that the municipality's action was facially unconstitutional but merely alleges that the municipality caused an employee to violate a federal right, a "rigorous standard of culpability…applie[s] to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405, 117 S.Ct. 1382. The plaintiff must demonstrate that the municipality itself acted with "deliberate indifference" to his

constitutional rights. *Id*. at 407, 117 S.Ct. 1382. This is not an easy showing. It requires the plaintiff to "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *LaPorta*, 988 F.3d at 987.

Finally, a plaintiff bringing a *Monell* claim must prove that the municipality's action was the "moving force" behind the federal rights violation. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382. This is a "rigorous causation standard" that requires the plaintiff to "show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *LaPorta*, 988 F. 3d at 987 (quoting *Brown*, 520 U.S. at 404, 117 S.Ct. 1382. These three requirements to establish a *Monell* claim – policy or custom, municipal fault, and "moving force" causation and "must be scrupulously applied" to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability. *Id*. That's especially true of the municipal-fault and causation requirements where (as here) "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless had caused an employee to do so." *Brown*, 520 U.S. at 405, 117 S.Ct. 1382. In these circumstances, a rigorous application of the proof requirements is especially important. *Id*.

Here, Rayford does not claim the Sheriff's Department took affirmative action to harm him. To the contrary, Plaintiff's theory of *Monell* liability roots itself in inaction – in gaps in the Jail's booking policy and its medication administration policy. According to Plaintiff, the Jail has no policy in which jail employees identify medical conditions of detainees in a timely, efficient, and reliable manner, and has no policy that requires jail

employees to obtain verification of prescribed medications no later than the time interval specified for administration of the medication on the prescription container. See Pl's MSJ, p. 35-37. Rayford contends that these failures to act were deliberate and together caused his constitutional injuries.

Because Rayford does not allege that the Sheriff's Department directly violated his rights, his "claim present 'difficult problems of proof.'" *Dean*, 18 F.4th at 236 (quoting *Brown*, 520 U.S. at 406, 117 S.Ct. 1382). A gap in policy "amounts to municipal action for *Monell* purposes only if the [municipality] has notice that its program will cause constitutional violations." *J.K.J.*, 960 F.3d at 379. Typically notice is established by "a prior pattern of similar constitutional violation." *Id.*, at 380.

Rayford does not submit any evidence of a prior similar incident – let alone a pattern of similar incidents under either the admissions booking policy or the medication administration policy. There is no evidence of any prior instances where epileptic inmates sustained serious injury as a result of a failure to receive timely seizure medications or otherwise receive proper medical care at the Jail. There is likewise no evidence of any prior instances in which inmates sustained serious injury because jail staff failed to summon emergency personnel in a timely manner. To be certain, discovery has not disclosed any prior instances of serious injury resulting from the incompetent delivery of medical services by medical personnel or resulting from the failure to timely administer prescribed medication.

Instead, Plaintiff insists that she can establish *Monell* liability under the alternative path which comes from a door the Supreme Court opened in *City of Canton*

*v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court observed that there may be circumstances in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that a factfinder could find deliberate indifference to the need for training. *Id*. at 390, 109 S.Ct. 1197. In that event, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation. *Id*.

In *Connick v. Thompson*, the Court renewed its prior observations that *City of Canton*, "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be held liable under section 1983 without proof of a pre-existing pattern of violations." 563 U.S. at 64, 131 S.Ct. 1350. As routinely emphasized, the possibility is rare, and the Supreme Court has yet to confront a case that presents a viable *Monell* claim based on a municipality's failure to act in absence of a pattern, and the Seventh Circuit has only done so on three occasions. See *Glisson v. Indiana Department of Corrections* (relied upon *City of Canton* to hold that an institution could be liable for failing to adopt protocols for the coordinates and comprehensive treatment of chronically ill inmates where the inaction came at a time the institution had notice of the problems posed by a total lack of coordination, but yet did nothing for more than seven years to address that risk); *Woodward v. Correctional Medical Services of Illinois, Inc.,* 368 F.3d at 929 (jury's *Monell* verdict upheld against a jail's healthcare provider for an inmate's suicide finding the

training on suicide prevention was so inadequate and so widely ignored that the contractor was on notice that a constitutional violation was a "highly probable consequence of its failure to act.); and *J.K.J v. Polk County*, 960 F.3d 367 (2020) (evidence was sufficient to prove at trial that county acted with deliberate indifference in failing to prevent and was the moving force behind male guard's repeated sexual assaults against two female county jail inmates where county had barebones sexual abuse policy and provided little training to guards on the topic, inmates testified that they were dependent on male guards for safety and other needs, expert confirmed that such power dynamic created serious risk for abuse for inmates, jail captain admitted he knew of male guards' sexually inappropriate banter, and even after learning of instances of sexual harassment and touching by one guard, county did not improve policy, institute additional training, or inquire of inmates about abuse).

As Rayford concedes, he must therefore establish that his case is within the "narrow range of circumstances" where notice can be inferred from the obviousness of the consequences of failing to act. *Id.* (quoting *Brown*, 520 U.S. at 409, 117 S.Ct. 1382). To succeed, Rayford must show that the "risk of constitutional violations" was "so high…that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380. Rayford has not cleared this high bar, in which cases the Seventh Circuit has found this standard to have been met the risks of municipal inaction have been blatantly obvious.

Here, it is not at all obvious that a policies providing for prompt and timely booking of inmates and administration of prescription medication would lead staff to provide constitutionally inadequate medical care to a detainee.  This is especially true in light of the Sheriff's policies for the admission of inmates and for the administration of medication to inmates and coupled with common understanding by jail staff of the goal to promptly book an inmate in to the jail facility and to provide proper and timely administration of approved inmate prescription medication.  Moreover, where Defendants have shown that the Jail's policies and procedures are within the accepted standards of the correctional industry (Defs' UMF, ¶¶ 52-53), Plaintiff presents no expert testimony to suggest otherwise, and the Jail had robust training requirements in place during the relevant time on the Jail's written policies and procedures, how to conduct a proper and thorough medical screening and on the procedures for appropriate referral of inmates to healthcare providers, notice has not been established of any deficiencies in the noted policies.  (Defs' UMF, ¶ 87).

There is simply no evidence that the Jail's policies caused Rayford's injuries.  Even if the staff violated Jail policies (which defendants contend staff did not); their actions did not result from any gap in the Jail's policies.  The fact is that the Sheriff's Department was not deliberately indifferent to the medical needs of inmates.  The Department, has, for years, had a contract with ACH and employed nursing staff to provide medical care to inmates at the Jail.  (Defs' UMF, ¶¶ 35-40).  The Department also had a contract to provide mental health care for inmates.  (Defs' UMF, ¶ 39). At intake and booking, it is the practice of the Department to determine whether inmates

have any medical and health-related issues through proper screening procedures; and upon self-reporting, that information is supplied to medical personnel on a timely basis. (Defs' UMF, ¶¶ 41-43,49-55, 58-61, 63-79). Upon receipt of medications brought into the Jail for an inmate, it is the practice of the Department to log the medication, place the medication in the nurses' locked medication box which the nurses check, and notify the Health Services staff of the medication. *Id.*

Accordingly, Plaintiff provided no evidence the Sheriff or County was on notice the Jail's policies or procedures were inadequate, and this claim must be dismissed.[2]

IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request this Honorable Court grant summary judgment to the Individual Correctional Defendants and the County/Sheriff, and for such further relief as this Court deems just and proper.[3]

MCLEAN COUNTY SHERIFF'S OFFICE, SHERIFF JON SANDAGE, MCLEAN COUNTY, THOMAS SCHROEDER, OFFICER REUTER, OFFICER PACHA, OFFICER WAHLS, OFFICER SMITH, OFFICER KERR, OFFICER MCCORMICK, OFFICER

---

[2] Plaintiff's request for punitive damages must be dismissed with prejudice as to the *Monell* claim against McLean County and the McLean County Sheriff's Department because local governmental entities, such as McLean County and the McLean County Sheriff, are immune from punitive damages under 42 U.S.C.§ 1981a(b)(1). Courts repeatedly hold that municipalities cannot be liable for punitive damages in various civil rights lawsuits, including lawsuits filed under 42 U.S.C. §1983, because municipalities are immune from punitive damages under section 1981. *Ferguson v. Joliet Mass Transit Dist.*, 526 F.Supp. 222, 223-25 (N.D. Ill. 1981) (extending municipal immunity from punitive damages to suits filed under 42 U.S.C. §1981); See also, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding municipalities are immune from punitive damages under 42 U.S.C. §1983); *Roberts v. County of Cook*, 213 F.Supp.2d 882 (N.D. Ill. 2002).

[3] Defendants have included their Exhibit List after the Certificate of Service section.

SCHAPMIRE, OFFICER HITCHINS, OFFICER
BUHLIG, OFFICER SWART, OFFICER MANN,
OFFICER STARR, and OFFICER MAYS, Defendants

By: ___s/_____*Carrie L. Haas*_____

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2023, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Mr. Shawn W. Barnett                         ***Attorneys for Plaintiff***
Mr. Jason Marx
Hale Monico
53 W. Jackson, Suite 337
Chicago, IL 60604
sbarnett@halemonico.com
jmarx@halemonico.com


Peter R. Jennetten                           ***Attorney for the Medical Defendants***
QUINN JOHNSTON
227 NE Jefferson Ave.
Peoria, IL 61602-1211
pjennetten@quinnjohnston.com
jennettenpleadings@quinnjohnston.com



                              *s/ Carrie L. Haas*
                         _____
                              Carrie L. Haas

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

LATASHA RAYFORD, as Guardian for   )
LaVonte Rayford,   )
   )
      Plaintiff,   )
   )
v.   )   Case No. 21-CV-1129
   )
McLEAN COUNTY SHERIFF'S OFFICE,   )
SHERIFF JON SANDAGE, McLEAN COUNTY,)
THOMAS SCHROEDER, OFFICER REUTER,   )
OFFICER PACHA, OFFICER WAHLS,   )
OFFICER SMITH, OFFICER KERR, OFFICER   )
MCCORMICK, OFFICER SCHAPMIRE,   )
OFFICER HITCHENS, OFFICER BUHLIG,   )
OFFICER SWART, OFFICER MANN,   )
OFFICER STARR, OFFICER MAYS,   )
MICHELLE WELCH, BONNIE BROWN,   )
SUZANNE SCOTT, NANCY GRIFFIN,   )
TERESA CIRKS, KATHY MURPHY,   )
JENNIFER GARCIA and CHERYL STURGILL, )
   )
      Defendants.   )

## EXHIBIT LIST

| | | |
|---|---|---|
| Exhibit 1 | Diane Hughes deposition | |
| Exhibit 2 | Diane Hughes declaration | |
| Exhibit 3 | Watch Commander Post Orders | MC 00027-00033 |
| Exhibit 4 | Booking Area Post Orders | MC 00012-00014 |
| Exhibit 5 | Access to Care | MC 00107-00109 |
| Exhibit 6 | Admissions Booking Procedure | MC 00043-00053 |

Exhibit 7              Receiving Screening              MC 00114-00116

Exhibit 8              Communication of Patients Health Needs        MC 00110-00112

Exhibit 9              Incoming Personal Property            MC 00101-00102

Exhibit 10             Pharmaceutical Operations            MC 00068-00072

Exhibit 11             Emergency Services                MC 00118-00120

Exhibit 12             Medication Services               MC 00078-00079

Exhibit 13             Continuity of Care                MC 00123-00125

Exhibit 14             Holding Cells                  MC 00292-00293

Exhibit 15             Medication Administration Training       MC 00060

Exhibit 16             Health Services policy and procedure acknowledgement MC 00106

Exhibit 17             Suzanne Scott deposition

Exhibit 18             Latasha Rayford deposition

Exhibit 19             Lavonte Rayford deposition

Exhibit 20             Dr. Norman Kohn deposition

Exhibit 21             Bonnie Brown deposition

Exhibit 22             Nancy Griffin deposition

Exhibit 23             Ken Pacha deposition

Exhibit 24             Scott Kerr deposition

Exhibit 25             Raymond Loftus deposition

Exhibit 26             Nancy Murphy deposition

Exhibit 27             Teresa Cirks deposition

Exhibit 28             Dr. Kohn 2021 report

| | | |
|---|---|---|
| Exhibit 29 | Nurse Wild declaration/report | |
| Exhibit 30 | Dr. Bates declaration/report | |
| Exhibit 31 | Medical Records – 11/10/18 – 11/28/18 | MC 01027-01039 |
| Exhibit 32 | Medical Records – 3/1/19 – 3/24/19 | MC 01007-01026 |
| Exhibit 33 | Medical Records – 6/26/19 – 8/14/19 | MC 00953-01006 |
| Exhibit 34 | Incident Reports – 11/10/18 – 8/14/19 | MC 01119-0126; MC 01268-01294; MC 01394-01415 |
| Exhibit 35 | Fitness Order 6/26/19 | MC 00256-00257 |
| Exhibit 36 | Sergeants' Reports 6/26/19 – 6/28/19 | MC 01373-01379 |
| Exhibit 37 | Field Arrest | MC 00332 |
| Exhibit 38 | Offender Booking Sheet | MC 00238-00239 |
| Exhibit 39 | Medical Screening Report 6/27/19 | MC 00126-00129 |
| Exhibit 40 | Jackie Mathias Note  6/26/19 | MC 00151 |
| Exhibit 41 | Isolation Logs 6/26/19 – 6/27/19 | MC 00377-00381 |
| Exhibit 42 | Pacha handwritten property receipt 6/26/19 | MC 00262 |
| Exhibit 43 | EJS Property Receipt – Schroeder | MC 01428 |
| Exhibit 44 | Loftus property receipt 6/27/19 | MC 00668 |
| Exhibit 45 | Email from Sun with screen shot of EJS notification to medical | MC 01366 |
| Exhibit 46 | Record from EJS showing Brown received | MC 00666 |
| Exhibit 47 | Officer McNamara Report 6/27/19 | MC 00192 |
| Exhibit 48 | Officer Wahls Report 6/27/19 | MC 00457-00459 |

Exhibit 49          Officer Swart Report 6/27/19                    MC 00460-00462

Exhibit 50          Officer Kerr email – time Lavonte returned to jail MC 01380

Exhibit 51          Deputy David Fritts declaration (includes 6/26/19 report)

Exhibit 52          Thomas McCormick declaration

Exhibit 53          Thomas Schroeder declaration

Exhibit 54          Jennifer Reuter declaration

Exhibit 55          Tyler Wahls declaration

Exhibit 56          Timothy Mann declaration

Exhibit 57          Sarah Buhlig declaration

Exhibit 58          Devon Swart declaration

Exhibit 59          Nicholas Hitchins declaration

Exhibit 60          Timothy Smith declaration

Exhibit 61          Mary Schapmire declaration

Exhibit 62          David Starr declaration

Exhibit 63          Michael Mays declaration

Exhibit 64          Dr. Hamilton fax – prescriptions                MC 00174-00175