## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LATASHA RAYFORD, as Guardian for LaVonte Rayford, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 21-cv-1129 |
| McLEAN COUNTY, *et al.*, | ) ) | |
| Defendants. | ) | |

### ORDER AND OPINION

Plaintiff Latasha Rayford, as Guardian for LaVonte Rayford, filed an Amended Complaint under 42 U.S.C. § 1983 alleging fourteen correctional staff members at the McLean County Detention Facility ("Jail") – Defendants Schroeder, Reuter, Pacha, Wahls, Smith, Kerr, McCormick, Schapmire, Hitchens, Buhlig, Swart, Mann, Starr, and Mays ("the Correctional Defendants) – and eight medical staff members – Defendants Welch, Brown, Scott, Griffin, Cirks, Murphy, Sturgill, and Garcia ("the Medical Defendants") – violated LaVonte's Fourteenth Amendment[1] rights while he was detained at the Jail on June 26-27, 2019. Plaintiff alleges Defendants McLean County Sheriff's Office and Jon Sandage, in his official capacity as Sheriff, are liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1997). Plaintiff seeks indemnification against Defendant McLean County under 745 ILCS 10/9-102.

This matter is now before the Court on the parties' cross Motions for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1(D). (Docs. 55, 92, 95). For the

---

[1] Plaintiff alleges Defendants deprived LaVonte of his Fourth Amendment due process right to adequate medical care. (Amended Complaint, Doc. 6 at 6-7). However, LaVonte was a pretrial detainee during the relevant time period. Therefore, his claims arise under the Fourteenth Amendment.

following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants'
Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff claims LaVonte was diagnosed with epilepsy and had valid prescriptions for anti-
seizure medication. (Doc. 6 at ¶¶ 14-16). On June 26, 2019, LaVonte was arrested and booked into
the Jail. *Id.* at ¶ 17. That evening, Plaintiff alleges she went to the Jail and gave LaVonte's
medication to a correctional officer and informed him LaVonte needed to take the medication
twice daily – once in the morning and once in the evening. *Id.* at ¶¶ 19-20. Plaintiff asserts LaVonte
did not receive his evening dose. *Id.* at ¶ 22.

Plaintiff claims she contacted the Jail on June 27 and informed an unknown nurse that
LaVonte needed to take his medication. *Id.* at ¶ 23. Plaintiff asserts the nurse told her there was no
verification from any medical professional that LaVonte needed to take seizure medication, and
absent that order, staff could not provide the medication. *Id.* at ¶ 24.

Plaintiff alleges she immediately contacted LaVonte's physician, which prompted a
member of the physician's staff to contact the Jail on June 27 at 10:20 a.m. to ensure LaVonte
received his medication. *Id.* at ¶¶ 25-26. The Jail then received a fax from LaVonte's physician on
June 27 at 10:45 a.m. containing a list of prescribed medications and the times LaVonte needed to
take them. *Id.* at ¶¶ 27-28. Plaintiff alleges LaVonte did not receive his morning dose. *Id.* at ¶ 29.

Plaintiff asserts LaVonte suffered at least three seizures on June 27 at approximately 1:30
p.m., 3:30 p.m., and 3:57 p.m. before being taken to the hospital due to his injuries because
LaVonte had not received his medication. *Id.* at ¶¶ 29-30, 35.

## MATERIAL FACTS

*Plaintiff Latasha Rayford & LaVonte Rayford*

On September 6, 2018, LaVonte Rayford was adjudicated disabled, and his mother, Latasha Rayford, was appointed his guardian. LaVonte was diagnosed with epilepsy, a seizure disorder, and prescribed medication in late 2002. (Doc. 55-1 at 42).

At approximately 3:10 p.m. on June 26, 2019, LaVonte was arrested and brought to the Jail. He was detained at the Jail until August 14, 2019, when he was transferred to Chester Mental Health Center.

*Medical Defendants*

At all relevant times, Defendants Michelle Welch, Cheryl Sturgill, Nancy Griffin, Bonnie Brown, Teresa Cirks, Suzanne Scott, and Kathy Murphy were employed by McLean County as nurses at the Jail.

Defendant Welch was an RN and held the position of nursing supervisor. She worked at the Jail on June 26 and 27 from 7:30 a.m. to 4:00 p.m. Defendant Sturgill worked as an LPN at the Jail from 6:00 a.m. to 7:15 p.m. on June 26. Defendant Nancy worked as an LPN at the Jail from 1:30 p.m. to 7:15 p.m. on June 26 and from 12:30 p.m. to 8:00 p.m. on June 27. Defendant Brown worked as an LPN at the Jail from 6:00 a.m. to 2:00 p.m. on June 27. Defendant Cirks worked as an RN at the Jail from 6:00 a.m. to 2:00 p.m. on June 27. Defendant Scott worked as an RN at the Jail from 7:00 a.m. to 4:30 p.m. on June 27. Defendant Murphy worked as an RN at the Jail from 2:00 p.m. to 9:00 p.m. on June 27.

*Correctional Defendants*

At all relevant times, Defendants Scott Kerr, David Starr, Nicholas Hitchins, Jennifer Reuter, Mary Schapmire, Michael Mays, Sarah Buhlig, Devon Swart, Tim Smith, Timothy Mann,

Tyler Wahls, Thomas McCormick, Thomas Schroeder, and Ken Pacha were employed as correctional staff at the Jail. Defendant Jon Sandage was the McLean County Sheriff.

Officers assigned to the Booking Area are generally responsible for receiving, processing, retaining, and releasing all persons admitted to the Jail. Officers assigned to the Booking Area also book new intakes into the Jail using the E*Justice System or "EJS," the Jail's computer management system, and conduct frequent and staggered supervision checks on inmates as required. Correctional staff also use EJS to communicate any reported medical concerns or needs to the Jail's medical staff.

**Defendant Ken Pacha** was assigned to the booking area during second shift from 3:00 p.m. to 11:00 p.m. on June 26.

**Defendant Scott Kerr** was on duty as the Watch Commander for second shift on June 26, worked four hours overtime from 11:00 p.m. to 3:00 a.m. in the booking area, and was the Watch Commander for second shift on June 27. Defendant Kerr had contact with LaVonte while conducting observation checks and did not observe him to be any medical distress. Defendant Kerr provided security and was standing by while the nursing staff provided care during at least two of the calls for medical assistance at LaVonte's cell on June 27. (Doc. 95-24 at 64:3-24, 65:1-22).

**Defendant David Starr** worked Post #7 Booking/Float from 7:00 a.m. to 3:00 p.m. and Post #3 Booking from 3:00 p.m. to 7:00 p.m. on June 27. He had contact with LaVonte while conducting observation checks and did not observe him to be any medical distress. Defendant Starr responded to the first call for assistance to LaVonte's cell at approximately 1:30 p.m. and the second call at approximately 3:13 p.m. (Doc. 95-62 at ¶ 8).

**Defendant Nicholas Hitchins** worked Post #3 in the booking area from 3:00 a.m. to 7:00 a.m. on June 27. (Doc. 95-59 at ¶ 3). He had contact with LaVonte while conducting observation

checks and did not observe him to be any medical distress. *Id.* at ¶¶ 5-6. As documented in the Isolation Logs, Defendant Hitchens observed LaVonte "resting" during his checks. *Id.* at ¶ 6.

**Defendant Jennifer Reuter** worked Post #3 in the booking area from 3:00 p.m. to 7:00 p.m. on June 26. (Doc. 95-54 at ¶ 3). She had contact with LaVonte while conducting observation checks at 5:45 p.m., 6:00 p.m., 6:14 p.m., and 6:28 p.m. and was not made aware of a need for medical attention. *Id.* at ¶¶ 5-7.

**Defendant Mary Schapmire** worked Post #3 in the booking area from 11:00 p.m. to 3:00 a.m. and Post 3 South from 3:00 a.m. to 7:00 a.m. on June 26 and 27. (Doc. 95-61 at ¶ 3). During her shift from 11:00 p.m. to 3:00 a.m., she had contact with LaVonte while conducting observation checks. *Id.* at ¶ 5. LaVonte did not request medical attention, nor did Defendant Schapmire observe any signs that medical care was needed. *Id.* at ¶¶ 6-7.

**Defendant Michael Mays** worked Post #2 in the booking area from 7:00 p.m. to 11:00 p.m. on June 27. (Doc. 95-63 at ¶ 3). According to Defendant Mays, he does not recall having any contact with LaVonte during his shift. *Id.* at ¶ 5. Based on the hours Defendant Mays worked, any contact would have been during observation checks conducted *after* LaVonte returned from the hospital. *Id.*

**Defendant Sarah Buhlig** worked Post #3 in the booking area from 7:00 a.m. to 11:00 a.m. on June 27. (Doc. 95-57 at ¶ 3). She had contact with LaVonte while conducting observation checks and was not aware of a need for medical attention. *Id.* at ¶¶ 5-7.

**Defendant Devon Swart** worked Post #3 in the booking area from 11:00 a.m. to 3:00 p.m. and Post #4 in the booking area from 3:00 p.m. to 11:00 p.m. on June 27. (Doc. 95-58 at ¶ 3). Defendant Swart had contact with LaVonte while conducting several observation checks. *Id.* at ¶ 6. According to Defendant Swart, he first became aware of LaVonte having medical issues due to

a call for assistance to his cell at approximately 1:30 p.m. on June 27. *Id.* at ¶ 8. Defendant Swart did not directly respond to the call, but he knew nurses had assessed LaVonte. *Id.* At 3:13 p.m., Defendant Swart responded to LaVonte's cell and observed him having what appeared to be a seizure. *Id.* at ¶ 9. Officer David Starr also responded and called for medical assistance at 3:14 p.m. *Id.* At approximately 3:55 p.m., Defendant Mann advised Defendant Swart that LaVonte was having another seizure. *Id.* at ¶ 10. Defendants called for medical assistance. *Id.* Defendant Swart entered the cell, rolled LaVonte on his side and noticed a knot above his right eye. *Id.*

**Defendant Tim Smith** worked Post #4 in the booking area of the Jail working from 7:00 p.m. to 11:00 p.m. on June 26. (Doc. 95-60 at ¶ 3). He had contact with LaVonte while conducting observation checks and did not observe any indication LaVonte needed medical attention. *Id.* at ¶¶ 5-6.

**Defendant Timothy Mann** was assigned to Post #8, 2 South from 7:00 a.m. to 3:00 p.m. and Post #2 in the booking area from 3:00 p.m. to 7:00 p.m. on June 27. (Doc. 95-56 at ¶ 3). During his shift in booking, Defendant Mann likely conducted observation checks on inmates housed in the booking area; however, the Isolation Logs indicate he did not conduct any observation checks on LaVonte. According to Defendant Mann, he first became aware of LaVonte having medical issues due to his involvement in a call for assistance to LaVonte's cell at approximately 3:13 p.m. *Id.* at ¶ 8. Defendant Mann was also involved in the third call for assistance to LaVonte's cell at approximately 3:55 p.m. *Id.* at ¶ 9.

**Defendant Tyler Wahls** worked Post #4 in the booking area from 3:00 p.m. to 7:00 p.m. on June 26. (Doc. 95-55 at ¶ 3). He also worked Post #2 in the booking area from 11:00 a.m. to 3:00 p.m. and as a float officer from 3:00 p.m. to 11:00 p.m. on June 27. *Id.* Defendant Wahls had contact with LaVonte while conducting routine observation checks at 12:00 p.m., 12:15 p.m., and

12:30 p.m. on June 27. *Id.* at ¶ 6. LaVonte did not ask for medical attention, and Defendant Wahls did not observe any indication that medical care was needed. *Id.* at ¶¶ 7-8. According to Defendant Wahls, he first became aware of LaVonte having medical issues due to his involvement in a call for assistance to LaVonte's cell at approximately 1:30 p.m. on June 27. *Id.* at ¶ 9. Defendant Wahls also responded to the third call for assistance at approximately 3:55 p.m. *Id.* at ¶ 10.

**Defendant Thomas McCormick** worked Post #2 in the booking area from 3:00 a.m. to 7:00 a.m. and then as Post #1 Sergeant from 7:00 a.m. to 3:00 p.m. on June 27. (Doc. 95-52 at ¶ 3). He had contact with LaVonte while conducting observation checks at 4:05 a.m., 4:45 a.m., 6:04 a.m., and 6:19 a.m. and observed LaVonte "resting." *Id.* at ¶¶ 5-6. According to Defendant McCormick, there was no indication that LaVonte needed medical attention, and LaVonte never informed him he was epileptic, needed to take medication, and was not receiving his medication. *Id.* at ¶¶ 6-7. As the Watch Commander on June 27, Defendant was involved in a call for assistance to LaVonte's cell at approximately 1:30 p.m. *Id.* at ¶ 12. Defendant was aware that Nurses Scott and Cirks assessed LaVonte, and he deferred to their determination that LaVonte did not need to go to the hospital. *Id.* at ¶ 13.

**Defendant Thomas Schroeder** was assigned to Post #2 Booking from 7:00 p.m. to 11:00 p.m. on June 26, worked as Post #1 Sergeant from 11:00 p.m. to 7:00 a.m. on June 26-27, and was assigned to Post #2 Booking from 3:00 p.m. to 11:00 p.m. on June 27. (Doc. 95-53 at ¶ 3).

While assigned to Post #2 Booking from 7:00 p.m. to 11:00 p.m. on June 26, Defendant Schroeder conducted observation checks on inmates housed in the booking area. *Id.* at ¶ 4. Defendant conducted observation checks of LaVonte at 7:45 p.m., 7:56 p.m., 8:18 p.m., 8:44 p.m., 9:31 p.m., and 10:00 p.m. *Id.* According to Defendant, there was no indication that LaVonte needed

medical attention, and LaVonte never informed him he was epileptic, needed to take medication, and was not receiving his medication. *Id.* at ¶¶ 5-6.

While working as Post #1 Sergeant from 11:00 p.m. to 7:00 a.m. on June 26-27, Defendant Schroeder was the Watch Commander who was responsible for making officer assignments to posts and providing overall supervision of the correctional staff and Jail operations. *Id.* at ¶ 7. Because that position was supervisory in nature, Defendant would not have typically been present in the booking area, and his contact with the inmate population was limited. *Id.* As such, Defendant conducted one observation check of LaVonte at 4:18 a.m. on June 27. *Id.*

According to Defendant Schroeder, his involvement with LaVonte's booking was limited to entering the handwritten items from the property receipt form completed by Defendant Sergeant Pacha into the EJS system and entering information into EJS to complete the Field Arrest Form. *Id.* at ¶ 8. As the Watch Commander on third shift, Defendant Schroeder would have been aware of the need to complete LaVonte's booking. *Id.* at ¶ 9.

Defendant Schroeder was likely aware of the calls for assistance to LaVonte's cell on June 27, but according to the incident reports, he did not have any direct involvement. *Id.* at ¶ 12.

***Procedures Regarding Medication at the Jail***

Jail Superintendent Diane Hughes, who is not named as a party, was responsible for day-to-day Jail operations and had personal knowledge of the policies and procedures in effect at the Jail in June 2019. (Doc. 95-2 at ¶¶ 2-3). Pursuant to Jail policy, medication will be accepted into the Jail and any medication brought in by an inmate or received from the public will be placed in the locked Medication Box in the Booking Clerk's office and logged on the Property Receipt. *Id.* at ¶ 32. If nursing staff were not on-site when the medication was brought in, it was the practice of correctional staff to notify the Health Services staff. *Id.* The nurses are required to check the

locked Medication Box in the Booking Clerk's office at least once a day and as otherwise needed. *Id.* at ¶ 33.

According to Jail policy, inmates entering the Jail with prescription medication will continue to receive the medication as prescribed, or acceptable alternate medications as clinically indicated. *Id.* at ¶ 37. Administration of the medication is to be completed in a timely manner following verification and an order from the Jail physician. *Id*. The process of verifying and authorizing medication for distribution to inmates involves calling the prescribing doctor or pharmacist and then calling the Jail's physician. *Id.* at ¶ 39.

Dr. Hughes Lochard was the Jail's physician and medical director. Dr. Lochard was considered "on-call" and available by telephone twenty-four hours a day, seven days a week. After the nurses left for the evening, correctional officers could reach Dr. Lochard regarding any medical situations that arose and could give medication to detainees as directed by Dr. Lochard.

Plaintiff contends that Defendant Correctional Officers had access, via EJS, to Medical Screening Reports, booking sheets, and other documents that were created during LaVonte's prior stints at the Jail on November 10-28, 2018, and March 1-24, 2019. Plaintiff asserts the various reports indicated LaVonte was epileptic, took medication for epilepsy, and Latasha Rayford was his emergency contact. Defendants admit they had access to these materials but did not review them, nor were they required to. (Doc. 93 at ¶ 35).

### The Events of June 26, 2019

LaVonte did not have his medications with him when he was arrested on June 26. At approximately 5:15 p.m., Plaintiff was placed in Booking Cell #9 at the Jail. At approximately 5:45 p.m., Jackie Mathias of Inmate Services met with LaVonte and assessed LaVonte to have situational depression/anxiety and stress reaction. During Ms. Mathias' assessment, LaVonte

reported compliance with his medications while outside of the Jail. Ms. Mathias noted that LaVonte would remain housed in booking for observation, counselors would follow up regularly, and medical staff would work to get his medications verified and approved.

On June 26 and 27, several correctional officers conducted frequent and staggered checks approximately every ten to fifteen minutes and documented their observations in the Isolation Logs. (Doc. 95-41).

On the evening of June 26, Plaintiff went to the Jail and gave Defendant Pacha the following bottles of LaVonte's prescription medications: Divalproex (16 pills), Phenytoin Sodium (31 pills), Lamotrigine (21 pills), Topiramate (26 pills), and Olanzapine (7 pills). Plaintiff told Defendant Pacha that LaVonte was epileptic, needed to take his medication that night, and if he did not take it, he would have a seizure. (Doc. 55-1 at 75:14-25; 99:1-10). Defendant Pacha testified he took the medications and placed them in the Medication Box for the Jail nurses to pick up. (Doc. 55-32 at 56-58). Per Jail policy, Defendant Pacha was also required to notify the Health Services staff that medication was brought in. (Doc. 95-2 at ¶ 32). Defendant Pacha testified that to the best of his recollection he either emailed Health Services staff or called and left a message. (Doc. 95-23 at 63:9-24, 64:1-17).

According to Plaintiff, she called the Jail between 8:30 p.m. and 9:30 p.m. on June 26 and asked the unknown correctional officer if LaVonte received the medication she dropped off. (Doc. 55-1 at 102:14-103:16). Plaintiff could not identify the officer she spoke with, and none of the Defendant Correctional Officers who were working that evening remember speaking to Plaintiff.

***Events on the Morning of June 27, 2019***

According to the Medical Defendants, they did not know Plaintiff dropped off LaVonte's medications the night before, as the booking clerk or sergeant was responsible for advising medical

staff that a family member dropped off medication. (Doc. 55-12 at 87). Plaintiff asserts the Medical Defendants knew or should have known medications had been dropped off the night before by checking the Medication Box.

Between 8:00 a.m. and 9:00 a.m. on June 27, Plaintiff dropped off another prescription medication for LaVonte, which was documented as having been received by Officer Loftus, placed in the Medication Box, and logged on the EJS generated Property Receipt Form.

According to Plaintiff, she spoke to an unknown Health Services staff member on the telephone and told her that LaVonte had not received his evening dose of medication on June 26, and that he needed to take his morning dose as soon as possible. According to Plaintiff, the nurse explained to her that nursing staff could not administer medication without approval and an order from the Jail's physician. Plaintiff could not identify who she spoke with. (Doc. 55-1 at 106:22-108:25). Defendant Nurses Scott, Cirks, and Brown, who were on duty that morning, do not recall speaking with Plaintiff. (Scott Dep., Doc. 55-12 at 91; Cirks Dep., Doc. 55-15 at 56-57; Brown Dep., Doc. 55-18 at 58).

At approximately 8:02 a.m. on June 27, Officer Loftus, who is not named as a party, spoke to LaVonte and completed the remaining booking documents, including the Medical Screening Report, which is the last step of the booking process. After the Medical Screening Report was completed, an automatic electronic notification via the EJS system was sent to the Health Services staff. (Doc. 95-2 at ¶¶ 27-39). Pursuant to Jail policy, Health Services staff will review all "notifications" on an ongoing basis and provide additional follow up as necessary. *Id.* at ¶ 30. Officer Loftus also printed a copy of the Medical Screening Report and placed it in LaVonte's physical inmate file. (Doc. 55-10 at 39:9-40:7).

At approximately 8:02 a.m. on June 27, the Health Services Unit received a notification in EJS indicating that LaVonte required medical attention. According to the EJS system, Defendant Nurse Brown viewed the notification at approximately 10:25 a.m. and deleted it.

According to Plaintiff, she called LaVonte's treating physicians to provide verification of his medications to the Health Services staff. At approximately 10:20 a.m., Defendant Brown received a call from a staff member at Dr. Robert Hamilton's office (LaVonte's psychiatrist) who inquired about LaVonte receiving his prescription medication.

At approximately 10:40 a.m., Defendant Brown received a fax from Dr. Hamilton's office stating that LaVonte was currently prescribed Depakote, Lamictal, Zyprexa, Zyprexa-ODT, Dilantin, Topamax, and Olanzapine.

**LaVonte's First Seizure on June 27 at 1:30 p.m.**

Correctional staff in the booking area during first shift on June 27 continued to conduct routine observations checks on LaVonte and did not observe any signs of distress until approximately 1:30 p.m., when an officer witnessed what was reported to be seizure-like activity. Officer McNamara, who is not named as a party, immediately called control to request medical assistance. Defendant Correctional Officers McCormick, Starr, and Wahls and Defendant Nurses Scott and Cirks responded.

After conducting a medical assessment, Defendants Scott and Cirks determined LaVonte did not need further medical attention, but they would continue to monitor him. Defendant Scott placed mats on the floor and instructed LaVonte to stay on the mats. (Doc. 55-12 at pp. 66-67).

Plaintiff contends that LaVonte suffered a seizure; however, Defendants dispute whether LaVonte suffered an epileptic seizure for which medication would be helpful. (Declaration of Dr.

12

Johnny Bates, Doc. 95-30). According to Defendants' expert, Dr. Johnny Bates, Plaintiff experienced a psychological non-epileptic seizure. *Id.* at ¶ 6.

***LaVonte's Second and Third Seizures on June 27***

At approximately 3:13 p.m. on June 27, Defendant Officer Swart was working in the booking area when he observed LaVonte lying on the floor experiencing what appeared to be a seizure. Defendant Officers Starr and Mann responded and called for medical assistance at 3:14 p.m. Defendant Nurses Griffin and Murphy responded to the reported seizure at approximately 3:18 p.m. and conducted an assessment. Defendants Swart, Starr, and Mann were informed the nurses would make calls to the Jail physician as they were trying to get LaVonte's medications approved. Defendant Griffin noted in the Progress Note: "Will continue to monitor." (Doc. 69).

According to the Progress Notes, Defendant Nurse Griffin received telephone orders from Dr. Lochard on June 27 at 3:30 p.m. for Prolax sodium, topiramate, and phenytoin sodium ("Dilantin") to be administered to LaVonte. (Doc 55-21 at 59:4-17).

Before Dr. Lochard's orders could be implemented, however, Defendant Officer Mann reported at 3:55 p.m. that LaVonte was having another seizure, had hit his head, and medical assistance was called. (Doc. 95-56 at ¶ 9). Defendant Officer Wahls responded at approximately 3:55 p.m. and moved an extra mat under LaVonte's head. (Doc. 95-55 at ¶ 10). Defendant Nurses Scott and Griffin responded at 3:57 p.m., assessed LaVonte, noted a bump over his right eyebrow, and ordered him to be sent to the hospital by ambulance. (Doc. 95-55 at ¶ 11).

At approximately 4:21 p.m., LaVonte left the Jail via ambulance and was treated at the emergency room of OSF St. Joseph Medical Center by Dr. Dishant Nagrani. LaVonte received seizure medication, a physical examination, bloodwork, a CT scan of his head/brain, which

revealed "right frontal/supraorbital scalp hematoma." (Doc. 73). LaVonte suffered no lasting physical or mental limitations due to the hematoma. (Doc. 95-19 at 55:13-21).

According to Defendants' expert, Dr. Johnny E. Bates, the episodes LaVonte suffered at approximately 1:30 p.m. and 3:13 p.m. on June 27 were "a psychological non-epileptic seizure and not a true epileptiform seizure." (Doc. 95-30 at ¶ 6). "The final episode prior to hospitalization is less clear and could be an epileptiform seizure or non-epileptic seizure." *Id.*

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## ANALYSIS

### I.  Fourteenth Amendment Claim

LaVonte was in custody after a finding of probable cause, but he had not been convicted of any crime. At issue are LaVonte's Fourteenth Amendment rights, not Fourth Amendment rights as Plaintiff asserts. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 792-93 (7th Cir. 2022); *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020).

Jail and prison officials must take reasonable measures to guarantee the safety of detainees. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Under the Fourteenth Amendment, Defendants' conduct is assessed using the objective reasonableness standard. *Jump*, 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 550); *see Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2019) (medical care claims brought by pretrial detainees under the Fourteenth Amendment are subject to the objective reasonableness inquiry).

To prove Defendants failed to provide reasonable medical care, Plaintiff must show Defendants acted purposefully, knowingly, or recklessly. *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). If Defendants were "aware that their actions would be harmful, then they acted purposefully or knowingly; if they were not necessarily aware but nevertheless strongly suspected that their actions would lead to harmful results, then they acted recklessly." *Pittman by & through Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823, 828 (7th Cir. 2020). Plaintiff must also show that the challenged conduct was objectively unreasonable. *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 354).

A court evaluating the reasonableness of medical care considers all the facts and circumstances faced by the individual alleged to have provided inadequate care and, without

considering the subjective beliefs held by that individual, whether the response was reasonable. *Id*.; *Jump*, 42 F.4th at 793. In assessing the reasonableness of a response, relevant factors include (1) notice of the medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment (balanced against the seriousness of the need); and (4) police interests, including administrative, penological, and investigatory concerns. *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403-04 (7th Cir. 2007) (discussing the factors in a case involving medical care claims arising under either the Fourth or Fourteenth Amendments)); *Pulera*, 966 F.3d at 552 (citing *Williams*, 509 F.3d at 403).

Objective unreasonableness under the Fourteenth Amendment cannot be shown through the actions of a collective group, as Plaintiff attempts to do here. *See Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014). Instead, Plaintiff must present enough evidence for a jury to find that a particular Defendant was personally involved. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Summary judgment is due defendants when no rational jury could find the official's actions objectively unreasonable under the circumstances." *Jump*, 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 555).

### A. Medical Defendants

The Medical Defendants argue they are entitled to summary judgment because there is no evidence that they acted "purposefully, knowingly, or recklessly" to deny LaVonte medical care or medication.

### i. Bonnie Brown

Defendant Brown worked as an LPN from 6:00 a.m. until 2:00 p.m. on June 27. Between 8:00-9:00 a.m., Plaintiff dropped off LaVonte's other medications and spoke to a nurse in the Health Services Unit on the phone and told the nurse that LaVonte had not received his evening

dose of medication on June 26 and he needed to take his morning dose. Defendants Brown and Cirks started work on June 27 at 6:00 a.m., Defendant Scott at 7:00 a.m., and Defendant Welch at 7:30 a.m., but Plaintiff does not recall the name of the nurse she talked to, and Defendants deny speaking with her.

At approximately 8:02 a.m. on June 27, the Health Services Unit received a notification in EJS indicating LaVonte required medical attention. According to the EJS system, Defendant Brown viewed the notification at 10:25 a.m., nearly two and half hours later. Although she viewed the notification, there is no evidence that she took any further action in response. In fact, the evidence shows that she deleted the notification.

At approximately 10:20 a.m., Defendant Brown received a telephone call from a staff member at Dr. Hamilton's office who inquired about LaVonte receiving his medications. There is no evidence that Defendant Brown checked the Medication Box to see if any medications were there.

At approximately 10:40 a.m., Defendant Brown received a fax from Dr. Hamilton's office, which included LaVonte's prescriptions. Defendant Brown admits she received the fax, but she asserts she could not give medication without Dr. Lochard's approval. She located LaVonte's chart and put the fax from Dr. Hamilton's office with LaVonte's chart for Dr. Lochard to review. There is no evidence that Defendant Brown called Dr. Lochard or followed up with him.

Defendant Brown asserts there is no evidence that the steps necessary to get medication to LaVonte, including approval from Dr. Lochard and obtaining them from the pharmacy, could have been or should have been accomplished before the seizure-like episodes began. Defendant Brown claims that her actions were objectively reasonable, and she did not act "purposefully, knowingly, or recklessly" to deny LaVonte medication.

The Court finds a reasonable jury could conclude Defendant Brown's actions, or inactions, were objectively unreasonable, but abundant disputed material facts preclude granting summary judgment in favor of Plaintiff and against Defendant Brown. Therefore, the Medical Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment as to Defendant Brown are DENIED.

### ii. Teresa Cirks and Suzanne Scott

On the morning of June 27, Defendant Cirks handled passing medications to detainees as ordered by Dr. Lochard. There was no approved medication order for LaVonte, and no order was received from Dr. Lochard until after Defendant Cirks was gone for the day. (Doc. 55-15 at pp. 10, 58, 60-61).

Defendants Scott and Cirks responded to LaVonte's first seizure at 1:30 p.m. on June 27. Defendants did not witness any seizure-like activity. Defendants assessed LaVonte, checked his vitals, performed an "arm-drop" test, and directed continued monitoring. Defendant Scott put mats on the cell floor and instructed LaVonte to lay on the mats to avoid further injury.

Following the seizure, Defendant Scott checked the EJS system, OSFelink, and looked for LaVonte's old chart. (Doc. 55-12 at 70:14-71:2-9). Defendant Scott discovered a list from Dr. Hamilton of some of LaVonte's medications in OSFelink, but Defendant claimed "[n]ot even Dr. Lochard, had we called him, would have approved some new dosage." *Id.* at 72:1-14.

Although LaVonte did not tell Defendants Scott or Cirks he was epileptic or ask for medication, a reasonable jury could find that it was reckless to simply place mats in the cell, order continued monitoring, and fail to provide his anti-seizure medication. There is no evidence that Defendants called Dr. Lochard, checked if any medication had been dropped off, or checked the nurses' voicemail or email for the alleged message from Defendant Officer Pacha. It is undisputed

18

LaVonte suffered additional episodes a couple hours later. A jury could reasonably conclude that LaVonte was harmed by the delay in not sending him to the hospital or by not giving him his seizure mediation after his first seizure. A delay is constitutionally significant if it "exacerbates the injury or unnecessarily prolongs an inmate's pain, particularly if ... the pain is treatable." *Hill v. Meyer*, 2022 WL 1078871, at *3 (7th Cir. Apr. 11, 2022). The length of delay that is permissible "depends on the severity of the condition and the ease of providing treatment." *Id.*

The Medical Defendants' Motion for Summary Judgment as to Defendants Scott and Cirks is DENIED. Due to the abundant disputes of material fact, the Court finds that it is more appropriate for a jury to determine if Defendants' conduct was objectively unreasonable under the circumstances. As such, Plaintiff's Motion for Summary Judgment as to Defendants Scott and Cirks is also DENIED.

### iii. Nancy Griffin

Defendant Griffin worked from 12:30 p.m. to 7:15 p.m. on June 26. LaVonte arrived at the Jail at approximately 3:10 p.m. Defendant Griffin and LaVonte were both at the Jail for approximately four hours on June 26, but during this time, there is no evidence that Defendant Griffin knew he was in custody or had emergent medical issues. Plaintiff did not drop off LaVonte's medications until after Defendant Griffin ended her shift. The Court finds Plaintiff failed to demonstrate Defendant's conduct on June 26 was objectively unreasonable.

On June 27, Defendant Griffin worked from 12:30 p.m. to 8:00 p.m. Her first involvement with LaVonte was responding to the second seizure with Defendant Murphy at 3:20 p.m. on June 27. Plaintiff asserts Defendant Griffin "made the unreasonable decision to 'continue to monitor' him, as opposed to calling 911 or giving him medication" after his second episode. (Doc. 100 at 79). However, the evidence shows that shortly after his second seizure, Defendant Griffin received

19

orders from Dr. Lochard and was working on obtaining medications for LaVonte. Approximately ten minutes later, LaVonte experienced a third seizure at 3:30 p.m. Defendant Griffin responded again, and LaVonte was sent to the hospital.

The Court finds that no reasonable jury would conclude Defendant Griffin acted purposefully, knowingly, or recklessly to deny LaVonte medication or medical care, nor was the care she provided objectively unreasonable. Therefore, summary judgment is GRANTED in favor of Defendant Griffin.

### iv. Kathy Murphy

Defendant Murphy worked from 2:00 p.m. to 9:00 p.m. on June 27. She did not arrive at the Jail until 2:00 p.m., thirty minutes after LaVonte's first episode. Defendant Murphy's first involvement with LaVonte was responding to the second episode with Defendant Griffin on June 27. Plaintiff argues Defendant Murphy should have called 911 or given LaVonte his medication instead of monitoring him after his second episode. Plaintiff did not present any evidence to show Defendant Murphy had the authority to send LaVonte to the hospital.

Plaintiff also asserts Defendant Murphy should have attempted to verify LaVonte's medications; however, the evidence shows that Defendant Griffin was in the process of verifying his medications after the second episode. Plaintiff does not point to any evidence, nor would it be reasonable to suggest that Defendant Murphy was obligated to duplicate Defendant Griffin's work. In fact, Plaintiff notes that Defendant Scott told Defendant Murphy she did not need to do anything else except document the incident because Defendant Griffin was working on obtaining LaVonte's medications.

The Court finds there is no evidence that Defendant Murphy acted purposefully, knowingly, or recklessly or that her actions were objectively unreasonable. Therefore, summary judgment is GRANTED in favor of Defendant Murphy.

### v. Cheryl Sturgill

Defendant Sturgill worked from 6:00 a.m. to 7:15 p.m. on June 26 and did not work on June 27. LaVonte entered the Jail at approximately 3:10 p.m. on June 26. Defendant Sturgill and Plaintiff were both at the Jail for approximately four hours on June 26. During this four-hour period, Defendant Sturgill argues she had no personal involvement with LaVonte and did not know he was in the Jail. By the time Plaintiff dropped off LaVonte's medications that evening, Defendant Sturgill's shift had ended.

Plaintiff asserts "[t]here is no evidence Cheryl took the same steps the other nurses failed to take to learn that LaVonte was in the jail and needed medical attention. There is also no evidence Cheryl was too busy to do so." (Doc. 100 at p. 80). However, there is no evidence Defendant Sturgill was obligated to seek out detainees in need of medical assistance. It is undisputed that the EJS notification regarding LaVonte's need for medical assistance was not received until the following morning at 8:02 a.m.

Plaintiff has not presented any evidence that Defendant Sturgill was involved in LaVonte's care or acted purposefully, knowingly, or recklessly to deny him medication or medical care. Summary judgment is GRANTED in favor of Defendant Sturgill.

### vi. Jennifer Garcia

Defendant Jennifer Garcia was an LPN at the Jail, but she did not work on June 26 or 27. In her Motion for Summary Judgment, Plaintiff concedes Defendant Garcia is entitled to summary

judgment. (Doc. 55 at p. 1, fn. 3). Therefore, summary judgment is granted in favor of Defendant Garcia.

### vii. Michelle Welch

Defendant Michelle Welch worked as an LPN and as the Responsible Health Authority ("RHA") at the Jail from 7:30 a.m. to 4:00 p.m. on June 26 and 27.

Defendants assert there is no evidence that Defendant Welch had any personal involvement with LaVonte. Before LaVonte was sent to the hospital on June 27, Defendant Welch was not advised that any medications had been dropped off, was not aware of any EJS notifications, and did not respond to any of seizures.

Plaintiff asserts that when Defendant Welch began her shift, she could have taken steps to learn that LaVonte was in the jail and needed medical attention. As previously stated, there is no evidence that Defendants were obligated to seek out detainees in need of medical assistance.

Plaintiff also asserts that when she called the Jail between 8:00-9:00 a.m., it is "certainly possible she spoke with Michelle, or the nurses discussed Latasha's call." (Doc. 100 at 80). This is merely speculation, as Plaintiff does not recall who she spoke with, nor is there any evidence she spoke with Defendant Welch.

Plaintiff argues that as the RHA, Defendant Welch was responsible for ensuring medications were verified and authorized in a timely fashion. *Id.* Simply being the head of the medical unit does not make Defendant Welch liable for any failure to provide medical care because there is no *respondeat superior* (supervisor liability) under § 1983. *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017); *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019). Plaintiff must be able to prove that Defendant Welch was personally involved in a constitutional violation. *Ashcroft*, 556 U.S. at 676. Here, the evidence shows that Defendant Welch was not personally

involved with LaVonte's care. No reasonable jury could find that Defendant Welch acted purposefully, knowingly, or recklessly. Summary judgment is GRANTED in favor of Defendant Welch.

### B. Correctional Defendants

Plaintiff asserts the Defendant Correctional Officers acted unreasonably by not providing LaVonte with his seizure medication or medical care following the first two seizures. (Doc. 6 at 40, 48-49). Defendants argue Plaintiff failed to identify how each officer had notice of a serious medical need or had any involvement in LaVonte's medical care.

#### i. Officers Pacha and Schroeder

On the evening of June 26, Plaintiff gave LaVonte's prescription medications to Defendant Pacha and informed him LaVonte was epileptic, needed to take his medication that night, and if he did not take it, he would have a seizure. Defendant Pacha then logged the medications in a handwritten Property Receipt instead of entering the information in EJS because LaVonte's booking was yet complete. Defendant placed the medication in the Medication Box for the nurses to pick up. Defendant Pacha testified it was his practice to either email Health Services or call and leave a message for Health Services if a family member dropped off medication. To the best of his recollection, Defendant did one or other. (Doc. 95-23 at 63:9-24, 64:1-17). Plaintiff asserts Defendant Pacha acted unreasonably by simply taking inventory of the medications and placing them in the box for the nurses to retrieve the next day.

When Defendant Schroeder began his shift in the booking area at 7:00 p.m. on June 26, he took steps to facilitate LaVonte's booking process by logging information to complete the Field Arrest Form and Property Receipt in the EJS system. The Property Receipt indicated that

"olanzapine, vivalproex, phenytonin sodium, lamotrigine, and topiramte" had been dropped off for LaVonte.

According to the Medical Defendants, there were no nurses at the jail after 7:15 p.m. on June 26. (Doc. 92 at 4-5). Defendants admit that Dr. Lochard was available twenty-four hours a day by phone for correctional officers to call, but neither Defendant Pacha nor Defendant Schroeder called Dr. Lochard to allow him to verify and administer LaVonte's medication. Additionally, when Defendant Schroeder's shift ended at 7:00 a.m. on June 27, there is no evidence he notified anyone that LaVonte's booking was incomplete or that his medication had been dropped off.

Defendants argue even if Plaintiff could prove that any lapse or delay in referring a need for medical attention to the Health Services Unit was attributable to Defendant Pacha (who received and logged the medications Plaintiff dropped off) or Defendant Schroeder (who entered the information in the EJS system), their conduct amounts to mere negligence, which is insufficient to establish a constitutional violation. *Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (failures in dispensing medication exactly as prescribed constituted negligence and did not amount to a constitutional claim); *Bruederle v. Louisville Metro*, 687 F.3d 771, 777 (6th Cir. 2012) (to the extent the booking officer incorrectly recorded answers or failed to contact the medical staff – that at most reflects negligent conduct).

The Court finds that a genuine dispute of material fact exists regarding whether Defendants' response (or lack thereof) to LaVonte's serious medical needs was objectively unreasonable. For instance, whether Defendant Pacha left a message for Health Services staff is a credibility determination that a jury must make. The parties' Motions for Summary Judgment as to Defendants Pacha and Schroeder are DENIED.

24

### ii.  Officers Hitchins, Reuter, Mays, Buhlig, Smith, Schapmire, and Kerr

Defendants Hitchins, Reuter, Mays, Buhlig, Smith, Schapmire, and Kerr argue they are entitled to summary judgment because they were not personally involved in LaVonte's intake and booking and did not provide medical care.

Officers may only be held constitutionally liable if they participated in the alleged violation. "Section 1983 creates a cause of action based on personal liability and predicted on fault; thus, liability does not attach unless the individual defendants caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Alleging claims against "all defendants" is also insufficient; a plaintiff must specify how each defendant was involved in the violation. *Brown v. Ill. Dep't of Pub. Aid*, 318 F. Supp. 2d 696, 700 (N.D. Ill. 2004) (dismissal when "allegations of unequal treatment [were] made generally against all defendants, [and] fail[ed] to allege the element of personal involvement necessary for individual liability under § 1983).

Here, Plaintiff failed to present any evidence that Defendants Hitchins, Reuter, Mays, Buhlig, Smith, Schapmire, and Kerr were involved in LaVonte's intake and booking, received his prescription medications, responded to calls for assistance to LaVonte's cell, or were personally involved in his medical care. With the exception of Defendant Mays who had no direct contact with LaVonte at all, the only involvement attributable to Defendants Hitchins, Reuter, Buhlig, Smith, Schapmire, and Kerr is that they happened to be working in the booking area at some point during the relevant time period and conducted routine observation checks on LaVonte. There is no evidence that LaVonte exhibited signs of medical distress during their observation checks or asked Defendants for medical attention or medication.

Defendants assert they were never informed that prescription medications had been dropped off. Plaintiff admits Defendants did not physically receive LaVonte's medication, but Plaintiff argues that "a simple viewing in EJS or LaVonte's inmate file would have revealed the inventoried medicine." (Doc. 101 at 115). Plaintiff does not present any evidence that Defendants were obligated to check EJS or LaVonte's inmate file. Based on the uneventful observation checks, they had no reason to. Any purported failure to do so amounts to mere negligence. The Court finds Defendants Hitchins, Reuter, Mays, Buhlig, Smith, Schapmire, and Kerr are entitled to summary judgment.

### iii.   Officers Starr, Wahls, Swart, Mann, and McCormick

Defendants argue there is no evidence Officers Starr, Wahls, Swart, Mann, and McCormick acted in an objectively unreasonable manner to deprive LaVonte of medication or acted with a reckless disregard for his health.

Defendants McCormick, Starr, and Wahls responded to LaVonte's first reported seizure at 1:30 p.m. Defendant Swart observed Plaintiff experiencing a second seizure at 3:13 p.m., and Defendant Starr responded by calling for medical assistance at 3:14 p.m. Defendant Officer Mann reported that LaVonte had a third seizure and hit his head at 3:55 p.m.

Defendants argue LaVonte was under the care of medical staff, and they deferred to the nurses' medical assessments. Plaintiff admits Defendants had no obligation to override the nurses' decision to "continue to monitor" LaVonte. Plaintiff asserts that Defendants should have told the nurses that LaVonte needed medication or that medication had been dropped off for him, but there is no evidence the officers were aware of this.

Here, the case law establishes that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison

26

official" does not establish the mental-state requirement for liability under section 1983. *See Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. 2019) (deliberate indifference); *Estate of Perry v. Wenzel*, 872 F.3d 439, 458 (7th Cir. 2017). "When detainees are under the care of medical experts, non-medical staff may generally trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 343; *Riley v. Kolitwenzew*, 2015 WL 12752685 (C.D. Ill. Jan. 9, 2015), *aff'd*, 640 F. App'x 505 (7th Cir. 2016) (non-medically trained jail personnel may defer to the judgment of medical personnel when an inmate is under the care of a nurse). The only exception exists "if jail officials had reason to know that their medical staff was failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343. Here, deferring decisions regarding medical care and medications to Health Services staff was reasonable. *See Diaz v. Godinez*, 693 F. App'x. 440, 444 (7th Cir. 2017) (officers "who are not part of the medical team have acted appropriately if they have referred the issue to medical staff who could be expected to address it.").

Defendants Starr, Wahls, Swart, Mann, and McCormick were not medical professionals and were entitled to rely upon the nurses' professional judgment. *See Perry*, 872 F.3d at 458-59; As such, Defendants Starr, Wahls, Swart, Mann, and McCormick are entitled to summary judgment.

### C. Qualified Immunity

Defendants argue they are entitled to qualified immunity because Plaintiff failed to demonstrate that they clearly violated LaVonte's Fourteenth Amendment rights.[2] Even if Plaintiff established such a violation, Defendants claim there is not a closely analogous case that would have provided them fair warning their alleged actions were unconstitutional. (Doc. 92 at 26-27; Doc. 95 at 62-63).

---

[2] It is undisputed that the individual nurses and correctional officers were county employees who may assert qualified immunity as a defense.

Qualified immunity "provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Even though qualified immunity "is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id*. Qualified immunity shields a public official unless the plaintiff can demonstrate that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Gerhartz v. Richert*, 779 F.3d 682, 688 (7th Cir. 2015).

A right is "'clearly established'" if it is "'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). Qualified immunity cannot be defeated merely by "alleging [a] violation of extremely abstract rights" or by defining the right in question "at a high level of generality." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). Instead, "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019).

To show that a right is "clearly established," the plaintiff must demonstrate that "closely analogous" caselaw or precedent finds the alleged violation unlawful. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). The plaintiff does not have to "point to an identical case, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *see also Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) ("The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'") (internal citation omitted)). In rare cases, a plaintiff can show a right is clearly

28

established without providing caselaw or precedent by "proving that the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Reed*, 906 F.3d at 547.

Here, Plaintiff asserts it was clearly established that medical and non-medical professionals cannot ignore an inmate's medical needs. *Arnett v. Webster*, 658 F.3d 742, 755-56 (7th Cir. 2011) (quoting *Farmer*, 511 U.S. at 837). There was also a clearly established right to prompt medical care. *Acosta v. City of Chicago*, 2018 WL 3630011, at *7 (N.D. Ill. July 3, 2018) ("[T]he right is prompt access to medical care, and whether officers can deny or delay an arrestee's access to a hospital when faced with a serious need is beyond debate.").

Because questions of material fact remain as to whether the actions of Defendants Brown, Scott, Cirks, Pacha, and Schroeder violated LaVonte's constitutional rights, qualified immunity is inappropriate. *See Isby v. Brown*, 856 F.3d 508, 530 (7th Cir. 2017) ("[w]hen no facts are in dispute, whether an official receives qualified immunity is a question of law. But in this case, ... facts are in dispute, precluding summary judgment for the defendants."). The Court finds that Defendants Brown, Scott, Cirks, Pacha, and Schroeder are not entitled to qualified immunity.

The Court found that Defendants Reuter, Wahls, Smith, Kerr, McCormick, Schapmire, Hitchens, Buhlig, Swart, Mann, Starr, Mays, Welch, Griffin, Murphy, Garcia, and Sturgill's conduct did not violate LaVonte's Fourteenth Amendment rights. As a result, the Court need not address whether these Defendants are entitled to qualified immunity. *See Johns v. Tinsley*, 2018 WL 10811472, at *5 (C.D. Ill. Mar. 7, 2018) (citing *Van den Bosch v. Raemisch*, 658 F.3d 778, 787 n. 9 (7th Cir. 2011)).

## II.     *Monell* Claim

Plaintiff argues Defendant McLean County Sheriff's Office has no policy in which Jail employees identify medical conditions of detainees in a timely, efficient, and reliable manner. In addition, Plaintiff asserts "the Sheriff's Office has no policy that requires Jail employees to obtain verification of prescribed medications no later than the time interval specified for administration of the medication on the prescription container, contrary to Illinois law." (Doc. 101 at 2).  Plaintiff claims these two "gaps in policy" were the moving force behind the constitutional violations LaVonte suffered. *Id.*

The Seventh Circuit has recognized three types of municipal action that can support liability under section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Speigel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Inaction can also give rise to liability if it reflects the municipality's conscious decision not to take action." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

A plaintiff bringing a *Monell* claim against a municipality "must show that the policy or custom demonstrates municipal fault." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Municipal fault is easily established when a municipality acts, or directs an employee to act, in a way that facially violates a federal right. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 404, 404-05 (1997).

On the other hand, where the plaintiff does not allege that the municipality's action was facially unconstitutional but merely alleges that the municipality caused an employee to violate a federal right, a "rigorous standard of culpability…applie[s] to ensure that the municipality is not

held liable solely for the actions of its employee." *Id*. at 405. The plaintiff must demonstrate that the municipality itself acted with "deliberate indifference" to his constitutional rights. *Id*. at 407. This is not an easy showing. It requires the plaintiff to "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

Finally, a plaintiff bringing a *Monell* claim must prove that the municipality's action was the "moving force" behind the federal rights violation. *Brown*, 520 U.S. at 404. This is a "rigorous causation standard" that requires the plaintiff to "show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *LaPorta*, 988 F. 3d at 987 (quoting *Brown*, 520 U.S. at 404). These three requirements to establish a *Monell* claim – policy or custom, municipal fault, and "moving force" causation and "must be scrupulously applied" to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability. *Id*.

Here, Plaintiff does not claim the Sheriff's Office took affirmative action to harm LaVonte. To the contrary, Plaintiff's theory of *Monell* liability roots itself in inaction – in gaps in the Jail's booking policy and its medication administration policy. According to Plaintiff, the Jail has no policy in which employees identify medical conditions of detainees in a timely, efficient, and reliable manner, and has no policy that requires employees to obtain verification of prescribed medications.

Because Plaintiff does not allege that the Sheriff's Office directly violated LaVonte's rights, Plaintiff's "claim presents 'difficult problems of proof.'" *Dean*, 18 F.4th at 236 (quoting *Brown*, 520 U.S. at 406). A gap in policy "amounts to municipal action for *Monell* purposes only

if the [municipality] has notice that its program will cause constitutional violations." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379 (7th Cir. 2020). Typically, "notice requires proof of a prior pattern of similar constitutional violations." *Id*. at 380. Here, the evidentiary record is insufficient to show a widespread practice of ignoring the serious medical needs of detainees, as Plaintiff improperly relies on one isolated incident. *See Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015) (a *Monell* claim requires "a widespread practice that permeates a critical mass of an institutional body," not "individual misconduct"); *see also Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023). While a Court may consider evidence of other similar instances of misconduct, Plaintiff does not assert similarities among other detainees. *See Carmona v. City of Chi.*, 2018 WL 1468995, at *2 (N.D. Ill. Mar. 26, 2018) (collecting cases).

Plaintiff has failed to establish that this case falls within the "'narrow range of circumstances'" where notice can be inferred from the obviousness of the consequences of failing to act. *J.K.J.*, 960 F.3d at 380 (quoting *Brown*, 520 U.S. at 409). To succeed, Plaintiff must show that the "risk of constitutional violations" was "so high…that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380. Plaintiff has not cleared this high bar. *See Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quotation and citation omitted) ("Qualifying circumstances under this doctrine are rare; [a] constitutional violation must be a blatantly obvious consequence of inaction for single-incident liability to apply."). Therefore, Defendants McLean County Sheriff's Office and Jon Sandage are entitled to summary judgment.

**IT IS THEREFORE ORDERED:**

(1)     Plaintiff's Motion for Summary Judgment [55] is DENIED. Defendants' Motions for Summary Judgment [92], [95] are GRANTED IN PART and DENIED IN PART.

(2)     Summary judgment is GRANTED in favor of Defendants McLean County Sheriff's Office, Jon Sandage, Officer Reuter, Officer Wahls, Officer Smith, Officer Kerr, Officer McCormick, Officer Schapmire, Officer Hitchens, Officer Buhlig, Officer Swart, Officer Mann, Officer Starr, Officer Mays, Michelle Welch, Nancy Griffin, Kathy Murphy, Jennifer Garcia, and Cheryl Sturgill. These Defendant are DISMISSED with prejudice. The Clerk is directed to TERMINATE these Defendants.

(3)     This case will proceed on Plaintiff's Fourteenth Amendment claim against Defendants Thomas Schroeder, Officer Pacha, Bonnie Brown, Suzanne Scott, and Teresa Cirks. McLean County remains a Defendant pursuant to the indemnification requirements of 745 ILCS 10/9-102.

(4)     This matter appears ready for trial. The parties are, within 14 days, to file a Notice of Compliance advising the Court of any outstanding matters and suggesting possible dates for trial. If the parties believe settlement negotiations might be fruitful, they are to so indicate in the Notice of Compliance and the matter will be referred to the Magistrate Judge for a settlement conference.

ENTERED:  2/21/2024

s/ James E. Shadid
James E. Shadid
United States District Judge